STATE

v.

**Raymond D. TEMPEST, Jr.**

No. 93–339–C.A.

Supreme Court of Rhode Island.

Jan. 11, 1995.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Aaron L. Weisman, Asst. Attys. Gen., for plaintiff.

William A. Dimitri, Jr., William C. Dimitri, Dimitri & Dimitri, Edward J. Romano, Providence, for defendant.

## OPINION

MURRAY, Justice.

## OPINION

This case comes before us on appeal by the defendant, Raymond D. "Beaver" Tempest, Jr. (defendant), from his conviction of murder in the second degree. The defendant contends that the trial justice erred in numerous respects and that as a consequence his conviction should be reversed. The relevant facts of the instant case set forth in the following text are gleaned from a voluminous record.

On February 19, 1982, at approximately 3:30 p.m., Douglas Heath (Heath) returned to the triple-decker apartment house at 409 Providence Street in Woonsocket, whose second-floor apartment he shared with his wife and his fifteen-year-old stepdaughter, Lisa LaDue (LaDue), formerly Lisa Wells. Below them, in the first-floor apartment, lived Susan Laferte (Laferte) and her husband, Ernie, the owner of the building, along with their daughters Nicole, aged three, and Marie, aged fifteen months. The third-floor apartment was occupied by Doreen Picard (Picard) and her boyfriend, Raymond Beaulieu.

Upon entering the house through the back door, Heath noticed Nicole crying on the first-floor landing next to the doorway leading down to the cellar. Heath asked Nicole where her mother, Laferte, was. Nicole replied that her mother was downstairs, lying down.

After finding the door to Laferte's first-floor apartment locked, Heath proceeded down the stairs leading into the cellar. From his vantage point at the bottom of the stairway, Heath saw a body "basically sitting" between the washer and drier at the far end of the cellar. Because there was "so much blood," Heath could not recognize the body as that of Picard, who was subsequently pronounced dead at 4:30 p.m. of the same day. As he began his approach toward Picard's body, Heath looked to his left and noticed a second body, that of Laferte, lying unconscious and face down in a "puddle of blood." Fearing that the unrecognizable body was that of his stepdaughter, LaDue, Heath ran upstairs, calling out LaDue's name; LaDue answered, whereupon Heath told LaDue to go downstairs and get Nicole while he called the police.

LaDue had arrived home shortly before her stepfather, at approximately 3:20 p.m. She proceeded to check the mailbox located at the front porch of the tenement house. After gathering the mail, LaDue walked around the exterior of the house and noticed a "big maroon car" parked in the driveway adjacent to the bulkhead leading into the cellar of the house. By the time of the victims' discovery, LaDue testified, the maroon car had disappeared and a rescue vehicle was parked in its place.

Entering through the back door of the house, LaDue saw Nicole in the "hallway crying saying her mother was downstairs sick." Believing that Nicole was just trying to get attention because LaDue heard "some moving around downstairs" at this point, she went upstairs to wait for her stepfather, Heath. Within a few minutes, LaDue saw her stepfather pull into the driveway and a few moments later heard him frantically calling out her name from the first floor.

Although severely beaten, Laferte survived her attack. However, she testified that because of the injuries sustained as a result of the assault she had "no recollection" of who had attacked her. Laferte had known defendant prior to the assault, having been the maid of honor in his wedding. Apparently she was also having an extramarital affair with defendant at the time of the attack.[1]

---

1. Susan Laferte testified that she had two extramarital affairs during 1981 and 1982 but as a result of her attack was unable to recall definitively if one of those relationships was with defendant. However, according to Ronald Vaz, defendant admitted that he was having an extra-

Prior to the crime, Laferte and her husband, Ernie, had arranged to mate their pit bull terrier with defendant's pit bull. In return for the use of his pit bull defendant was to receive the pick of the subsequent litter.

The defendant in turn had promised the dog to John Allard (Allard), who at the time was living with Sherri Richards (Richards), defendant's former sister-in-law. On the morning of February 19, 1982, Allard and defendant arranged to meet at Allard's house in order to pick up the dog from Laferte. At approximately 12:30 p.m. defendant walked over to Allard and Richards's house with his two children whom Richards had agreed to watch. According to Richards, Allard and defendant were picked up by Allard's brothers between 1:20 and 1:30 p.m.

Allard and defendant arrived at Laferte's first-floor apartment, picked out a puppy, and left without incident before 1:45 p.m., according to Carol Rivet (Rivet), Laferte's sister, who was then present in the apartment. The defendant subsequently arrived back alone at Richards's apartment between 2 and 2:30 p.m. in a car borrowed from his brother John Tempest. Upon arriving at the apartment, defendant informed Richards that he was going to meet his brother-in-law Bobby Monteiro (Monteiro)[2] at Sylvia's Lounge in Woonsocket, return his brother's car, and walk back to Richards's apartment. The defendant then left. The next time he arrived back at Richards's was between 4:30 and 4:45 p.m. Approximately five minutes before, Allard had arrived home with a pit bull puppy.

Richards stated that defendant was in her driveway "standing on the outside of Bobby Monteiro's car with the door partly open talking to" Monteiro. Monteiro's car was described by Richards as "huge," "maroon," and "four door." Richards testified that de-

fendant was wearing the same clothing that he had been wearing when he arrived except that he had changed his boots. Additionally he had a bite or scratch mark on his wrist that had not been there earlier. The defendant also appeared to have been drinking shortly before his arrival.

Around 5 p.m. defendant and Allard went out to get a pizza. During that time defendant's brother Gordon Tempest (Gordon),[3] then a detective sergeant and second in command of the Woonsocket police department's night division, called. Gordon called to inform Richards about Laferte. Richards responded that both defendant and Allard had been there earlier in the day. Gordon then told Richards to have defendant either call or come by the station. When defendant and Allard arrived back, Richards informed them of Gordon's call. Both were in shock over the incident and subsequently decided to walk over to the police station, not returning until 10 or 11 p.m.

The next day, February 20, 1982, defendant arrived back at Allard and Richards's apartment. The three of them, Allard, defendant, and Richards, sat around the kitchen table to discuss "what happened the day before about Sue [Laferte] and to think about who did it and to decide what we were going to say." The three made an agreement to say that defendant had been at Allard's father's house with Allard.[4]

In the years following Picard's death defendant admitted his responsibility for the murder to numerous people. One of these somewhat bizarre incidents occurred at the end of 1982 or early in 1983, when John Guarino (Guarino), who lived in the apartment above defendant, went out with him to the Providence nightclub Allary's (now Sh-

---

marital affair with Laferte at the time of the attack. Terrence Gelinas also testified that defendant had expressed regret for having had an affair with Laferte.

2. Monteiro was called as a witness in the state's case in chief but repeatedly invoked his Fifth Amendment privilege against self-incrimination to questions propounded by the state.

3. On July 6, 1993, Gordon Tempest was convicted of seven counts of perjury, *State v. Gordon*

*Tempest*, K1/92–0937A, five counts for false testimony given at this trial and two counts for falsely testifying before the grand jury. This case is currently on appeal.

4. According to Richards, the alibi was needed only because defendant had borrowed his brother John's car that afternoon in order to purchase cocaine and wanted to hide this fact from the police.

Booms). During the course of a few drinks, while seated at a table, Guarino, "out of curiosity," asked defendant if "he committed the murder." Guarino testified that defendant

> "told me he went into the basement of the house where the Picard girl lived and he said that he had—his right hand was moving up and down when he was talking to me and he told me that he hit one of them over the head and another woman came down [into the cellar] and he had to beat her up, too."

Guarino testified he did not take defendant seriously at this point because while explaining what he had done, defendant was "kind of laughing." However, Guarino did take it seriously enough that upon arriving home, he woke up his then-girlfriend Donna Bousquet (Bousquet), presently Donna Carrier, and told her what defendant had said.

A few weeks after this conversation, defendant came to Guarino and Bousquet's apartment and appeared "very, very nervous." According to Guarino, defendant stated that the cops were outside watching his house. He also threatened Guarino, saying that Guarino had better keep his mouth shut in reference to their conversation at Allary's. Additionally defendant again admitted his responsibility for the murder but added "they have no proof."

This entire conversation was overheard by Bousquet who was sitting in the next room a few feet away. She stated that defendant "was very upset because Sue [Laferte] was going to tell Jane (defendant's wife at that time) something and that he and Jane had just gotten back together." She further testified that defendant said that "the other girl came down the stairs at the wrong time, saw him hitting Sue. He couldn't let her get away and he had to do her, too." He also explained that when he left, no one saw him come in and that he was well aware that the two women were seriously injured.

On numerous other occasions defendant also admitted his culpability to Ronald Vaz (Vaz), a man with whom defendant occasionally snorted cocaine. The first of these occasions was two days following the murder. According to Vaz, defendant was jogging when Vaz pulled his car over to talk with him. In the ensuing conversation, defendant questioned Vaz, asking, " 'Danny [Shaw] told you everything about it?' " Vaz replied that Shaw had. This response prompted defendant to reply that defendant was in serious trouble and that " '[t]hey'll get me for this one * * * my father won't get me out of this one.' " [5]

In the following months defendant, during a series of visits to Vaz's house, gave fairly detailed accounts of what had occurred. Vaz testified that defendant stated that he had left the crime scene with Shaw and Monteiro in Monteiro's big maroon car. The three had stopped in order for defendant to call his father, Raymond Tempest, Sr. (Ray, Sr.), but could only reach his brother Gordon. After the call the three returned to defendant's house because defendant had some blood on him; he also wanted to call Gordon again. On another visit to Vaz's house, defendant told Vaz that he was afraid Monteiro would talk, stating that Monteiro " 'had said something to somebody about the murder and that he was kind of the weak link in this case.' " He also explained to Vaz that his father had told him to get some "strong" alibis.

On still another occasion defendant told Vaz that on February 19, 1982, he had an argument with Laferte in the cellar of her apartment house over the dog defendant was supposed to receive. This argument led into a further quarrel over the relationship the two were having. Apparently, Laferte wanted defendant to leave his wife while she in turn would leave her husband; he refused. Following his refusal Laferte hit defendant, who in turn beat her. On yet another occasion defendant arrived at Vaz's house with police pictures taken of the two women immediately following the attacks. He passed them around and commented, " 'They said I

---

**5.** The defendant's father, Raymond Tempest, Sr., was a chief inspector of the Woonsocket police department, second in rank only to the chief of police, and later accepted an appointment to become high sheriff of Providence County.

did a bad job * * * I don't think I did a bad job, do you?' "

The defendant also admitted his culpability in the murder to Loretta Rivard (Rivard). In January 1988 Rivard and defendant met for the first time at a bar in Blackstone, Massachusetts, although Rivard already knew him by sight. After about ten or fifteen minutes of conversation, defendant asked Rivard if she wanted to go out to his car and snort some cocaine. After ten minutes of snorting cocaine in defendant's car, they reentered the bar and drank a few more beers. A half an hour later, defendant asked Rivard if she wanted to go back to her house and " 'party.' " She agreed. At her house they snorted some more cocaine and consumed more beer. During this time and without any inducement, defendant stated to Rivard, " 'Do you remember the girl that was killed in the basement in Woonsocket? * * * I killed her * * * [b]ut I'll get away with it, I'm a Tempest, I'll slide.' "

On June 4, 1991, following a decade of police investigation, defendant was indicted for murder in violation of G.L.1956 (1981 Reenactment) §§ 11–23–1 and 11–23–2. The defendant was tried before a jury. The trial lasted over fifteen days, during which more than forty witnesses gave testimony. On April 22, 1992, the jury returned a verdict of guilty of murder in the second degree. After filing a motion for new trial that was denied, defendant was subsequently sentenced to eighty-five years imprisonment. The defendant now appeals.

## I

## PROSECUTION'S OPENING STATEMENT

The defendant's initial ground for appeal is that remarks made in the prosecutor's opening statement were "inflammatory" and "prejudicial." Therefore, according to defendant, the trial justice erred in denying defendant's motion to pass the case and declare a mistrial, notwithstanding the trial justice's curative instructions to the jury. Specifically, defendant points to the following statements made by the prosecutor:

"Good afternoon, your Honor, ladies and gentlemen of the jury. At this point I have the opportunity to make an opening statement to you about what the State intends to prove during the course of this trial. You are about to hear a very sad story. You are about to hear about a young lady, twenty-two years old, who was brutally murdered when she walked into her basement to do her laundry. You are about to hear a lot of witnesses. You are going to hear about a lot of events. But when it's all said and done, what you are going to hear, what you are going to remember, is the arrogance of this man who boasted about having committed this horrible crime."

At this point defense counsel objected that "[t]his is argument, this is final argument." The trial justice agreed, admonishing the prosecutor that he "should refrain from making final argument." After apologizing to the court, the prosecutor began anew, stating:

"You will hear the statements of the defendant to his friends, to his neighbors, and to virtually strangers that he committed this crime. Not only that he committed this crime, but that he would slide, his own words. That he would beat the crime. But ten years later, we are here. And he must face, you, the jury. The problem in this tale is two fold. First of all, it's ten years. There are a lot of events that have happened."

Again defense counsel objected and made a motion to pass the case stating "that the comments of the prosecutor are inflammatory and designed to prejudice the jury. He was admonished on one occasion and persisted in doing it, your honor."

The court denied the motion to pass but admonished the jury: "Ladies and gentlemen of the jury, the prosecutor in his opening remarks made some generalizations to you and some characterizations. Those are most improper and you are instructed to totally disregard them, forget about them. Forget you've ever heard them." The trial justice then instructed the prosecutor to begin anew and tell the jury what the prosecution intended to prove.

■ When a defendant objects to allegedly prejudicial remarks made by a prosecutor, the trial justice must evaluate whether the prejudicial effect, if any, is inexpiable. *State v. Collazo,* 446 A.2d 1006, 1010 (R.I. 1982); *see State v. Ware,* 524 A.2d 1110, 1112 (R.I.1987). If the prejudicial impact is inexpiable, notwithstanding the trial justice's timely instructions, the motion to pass must be granted. *Collazo,* 446 A.2d at 1010. This court, like the trial justice, cannot utilize any fixed rule of law to determine whether a challenged remark is incurably prejudicial but instead must assess the probable effect of the remark within the factual context of the evidence presented. *State v. Lane,* 609 A.2d 633, 636 (R.I.1992); *Ware,* 524 A.2d at 1112; *Collazo,* 446 A.2d at 1010. Incurable prejudice exists if the trial justice determines that the remark, within its factual context, "so inflames the passions of the jury as to prevent their calm and dispassionate examination of the evidence." *State v. Brown,* 522 A.2d 208, 211 (R.I.1987).

■ Applying these precedents, we are persuaded that the prosecutor's statements, when viewed in their totality, were not so inflammatory as to prevent the jury from impartially rendering a verdict. As we have often noted, a decision on a motion to pass a case and declare a mistrial lies within the sound discretion of the trial justice and will not be disturbed on appeal unless clearly wrong. *Ware,* 524 A.2d at 1112; *State v. Ucero,* 450 A.2d 809, 814 (R.I.1982). The rationale behind investing the trial justice with such extensive powers is that he or she possesses "a 'front row seat' at the trial and can best determine the effect of the improvident remarks upon the jury." *State v. Pailin,* 114 R.I. 725, 729, 339 A.2d 253, 255 (1975); *see Ucero,* 450 A.2d at 814.

In the present case we believe the trial justice was well within his discretion in evaluating these remarks and was not clearly wrong in denying defendant's motion to pass. Although we believe these remarks would very well have been more suitable for final argument than the opening statement, we are of the opinion that these comments were not "so flagrantly impermissible that even the cautionary instructions which were given

were insufficient to assure defendant[ ] the fair and impartial trial which was [his] due." *State v. Bowden,* 113 R.I. 649, 654, 324 A.2d 631, 635 (1974). Given the nature of these remarks and the context in which they were made, the trial justice's curative instructions were both timely and effective. *Collazo,* 446 A.2d at 1010. Therefore, defendant was not deprived of his right to a jury's calm and dispassionate examination of the evidence. *Brown,* 522 A.2d at 211.

## II

### THE CROSS–EXAMINATION OF GORDON TEMPEST

The defendant's next ground for appeal is that the trial justice erred by denying defendant's motion to pass the case on the basis of a number of alleged instances of prosecutorial misconduct occurring during the cross-examination of Gordon. The defendant's initial claims of error concerning this cross-examination arose out of the following exchange:

"PROSECUTOR: Do you remember having a conversation in 1982 with Estelle Accord at the St. James Hotel?

"GORDON: No. I can't remember that far back.

"PROSECUTOR: In 1982, did you tell Estelle Accord that your brother Beaver had killed Doreen Picard and that Raymond Tempest, Senior, would make sure that nothing happened to Beaver?

"COUNSEL: Your honor, I object to this.

"THE COURT: Well, he said he couldn't recall that far back. Overruled.

"COUNSEL: I want to see the statement, Judge. I would like to see the statement.

"THE COURT: Show him the statement.

"COUNSEL: May I see the statement?

"PROSECUTOR: Its just impeachment purposes.

"THE COURT: Actually, that's right. Its a matter of courtesy. If you don't want to, you don't have to.

"PROSECUTOR: I only have one copy. I will be happy to share it."

After sharing the document with defense counsel, the prosecutor, without objection, again asked Gordon about his alleged statements to Estelle Accord (Accord). Gordon denied making such a statement. The following morning defense counsel moved to pass the case on the basis of the above exchange. The trial justice denied the motion, stating, "I'm not going to grant the motion because I think it was impeachment that was carried out." He also issued a curative instruction regarding the prosecution's use of the statement summary.

On appeal, defendant contends that the motion should have been granted because the prosecutor "danced around the Courtroom with a document giving the jury the impression * * * this was a statement from a person named Estelle Accord" when it was only an unsigned summary of Accord's statements taken by an investigator of the Department of the Attorney General. The defendant also asserts that the state's failure to disclose Accord as a witness and the summary of her statements violated Rule 16(a) of the Superior Court Rules of Criminal Procedure and Rule 613(a) of the Rhode Island Rules of Evidence. Additionally defendant complains that the state failed to establish the proper foundational requirements for use of the summary as a prior inconsistent statement and that the summary was "blatant hearsay." Finally defendant avers that "the mere assertion that Gordon Tempest had made a statement to Accord that Raymond, Jr. killed Picard, and that Raymond, Sr. would obfuscate justice to prevent prosecution, without proof was willful conduct pro se." It was argued that as a result of these actions, defendant's right to a fair trial was so tarnished that the motion to pass should have been granted.

■ It is well settled that a "witness's testimony at trial may be impeached by the admission of prior statements made by the witness which are inconsistent with his trial testimony." *State v. Cianci*, 430 A.2d 756, 762 (R.I.1981). Such statements are not hearsay when offered for such a purpose. *State v. Coppola*, 502 A.2d 802, 804 (R.I. 1985). Furthermore, the statement need not be admitted into evidence in order to impeach the witness. R.I.R.Evid. 613(a). However, the examiner must establish the express foundational requirements of apprising the witness of the "time, place, persons present, and nature of the statement * * * prior to examination on the statement." *Id.;* *State v. Vento*, 533 A.2d 1161, 1164 (R.I. 1987). Additionally the witness's prior statement must be sufficiently inconsistent with the witness's in-court testimony to be admissible. *State v. Pusyka*, 592 A.2d 850, 853 (R.I.1991). The determination of whether sufficient inconsistency exists lies within the sound discretion of the trial justice and will not be disturbed unless clearly wrong. *Id.*

In the present case Gordon testified on direct examination that he never spoke to his father, Ray, Sr., about the homicide on the day of the murder. He also stated that other than taking a routine statement from his brother the day of the murder at the Woonsocket police station, he had never had a discussion concerning the Picard murder with defendant. The clear tenor of Gordon's testimony on direct examination was that he did nothing out of the ordinary in investigating this case.

On cross-examination the prosecution asked Gordon, "Do you remember having a conversation in 1982 with Estelle Accord at the St. James Hotel?" After Gordon denied having any memory of the conversation, the prosecutor asked "In 1982, did you tell Estelle Accord that your brother Beaver had killed Doreen Picard and that Raymond Tempest, Senior, would make sure that nothing happened to Beaver?" After a brief and pointed discussion among the trial justice, prosecution and defense counsel, Gordon resumed testifying and denied that he ever had any such conversation with her.

■ Once Gordon denied remembering the conversation, he was, for purposes of impeachment, considered as having denied having made the statement. *Ashton v. Higgins*, 80 R.I. 350, 357, 96 A.2d 632, 636 (1953). Given Gordon's statements on direct examination and the entire tenor of his testimony, we cannot say the trial justice was clearly wrong in determining the inconsistency of these statements. *Pusyka*, 592 A.2d at 853; *see United States v. Barrett*, 539 F.2d 244,

254 (1st Cir.1976) (enough contradiction exists if witness's in-court testimony, taken as a whole, either by what it says or by what it fails to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict). We are therefore satisfied that these questions sufficiently satisfied the foundational requirements for the introduction of a prior inconsistent statement.

We note that the prosecution had a good-faith belief as a basis for this question. When the trial justice expressed concern over the summary, the prosecutor responded that Accord would be brought in to testify to the conversation. In fact the next day the record reveals that Accord was in the courtroom, ready to testify to the conversation with Gordon. However, the trial justice refused to allow her to testify because her testimony would have been rebuttal on a collateral issue. Therefore, we are not confronted with a situation wherein counsel has made a prejudicial assertion of fact without any basis for having done so. *But cf. State v. Byrnes*, 433 A.2d 658, 676–77 (R.I.1981) (defense counsel attempted to impeach witness with a prior inconsistent statement prior to establishing the proper foundational requirements and without any proof, or subsequent ability to prove, that the statement was ever made).

We are, however, somewhat troubled with the prosecution's use of the summary of Accord's statements in the present case. In the cross-examination of Gordon about Accord, the prosecutor had the summary in his hand. We are mindful that when counsel cross-examines a witness about a prior inconsistent statement with a document in his or her hand, it may be argued that it is possible, though scarcely inevitable, that jurors might infer that the document contains a direct statement given by the witness. The trial justice realized this and issued a curative instruction stating:

"[The prosecutor] asked Mr. Tempest (Gordon) if he had told Estelle Accord in 1982 at the St. James Hotel that his brother had killed Doreen Picard. In asking that question, which Mr. Gordon Tempest denied making, [the prosecutor] was holding and apparently looking at a piece of paper which may have caused you to imply that [the prosecutor] was reading from a statement given by Miss or Mrs. Accord. A reading of that piece of paper shows clearly that it was not a statement given by Miss or Mrs. Accord. I trust you will put aside and out of your minds any implications that you derive from [the prosecutor's] questions that are contrary to the facts which I have just explained to you * * * [the prosecutor] did not have in his hand any statement given by Miss or Mrs. Accord."

█ We believe that the trial justice's curative instruction removed any prejudice that may have inhered to defendant through the prosecution's use of the summary in this case. In fact it tended to create the counter-impression that Gordon never had had any such conversation with Accord. Therefore, we are of the opinion that defendant was not denied his opportunity for a fair trial. *State v. Mastracchio*, 612 A.2d 698, 703–04 (R.I. 1992). Indeed he may have been given more relief than the circumstances required.

The defendant next contends that the failure to disclose Accord's existence and a copy of her summarized statements violated Rule 16 of the Superior Court Rules of Criminal Procedure and Rule 613(a) of the Rhode Island Rules of Evidence. Pursuant to Rule 16(a)(6) the state is required, upon written request, to furnish defendant with "a written list of the names and addresses of all persons whom the attorney for the State expects to call as witnesses at the trial in support of the State's direct case"; "[A]s to those persons the state expects to call as witnesses at the trial," Rule 16(a)(7) requires the state to produce "all relevant recorded testimony before a grand jury," "all written or recorded verbatim statements," and "if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial."

Accord had come to the attention of the Attorney General's office shortly after the trial began when her employer called to report that Accord had just told him of her conversation with Gordon at the St. James

Hotel. It was the first time the state had any notice of her existence. Furthermore, the state had no intention of calling her in its case in chief. In fact her statements would have been impermissible hearsay if adduced during the state's case. R.I.R.Evid. 801(c). At best, therefore, Accord was a rebuttal witness.

■ We need not, however, decide whether Rule 16 requires the state to previously list any rebuttal witness it expects to call to determine the issue before us. In the instant case the trial justice refused to allow Accord to testify in rebuttal of Gordon's testimony deeming that "her testimony would be rebuttal on a collateral issue." We have grave doubts concerning this ruling since this issue was directly relevant to the witness's knowledge of the guilt of the accused. However, even if Accord's proposed testimony would in fact have been improper without prior disclosure, it was never put before the jury. *But cf. State v. O'Dell,* 576 A.2d 425 (R.I.1990) (state called rebuttal witness, whose identity and testimony had not been previously disclosed, to contradict statements adduced by the state's cross-examination of the defendant). Therefore, this is not a case in which a surprise rebuttal witness was improperly allowed to testify, leading to irreparable harm to the defendant. *Id.* at 429–30.

■ With respect to defendant's argument based on Rule 613(a), the rule is clear that in examining a witness about a prior inconsistent statement made by the witness, "the statement need not be shown to the witness at that time" and "on request" the statement *"shall* be shown to opposing counsel." (Emphasis added.) We believe this language is unequivocal. When opposing counsel requests to see a prior statement or statement summary of a witness used by counsel during cross-examination of that witness, the statement must be disclosed at that time, absent a legitimate claim of privilege or confidentiality. *See United States v. Lawson,* 683 F.2d 688, 694 (2nd Cir.1982).

■ In the instant case defense counsel requested to see the summary of Accord's statements that the prosecutor held in his hand during cross-examination of Gordon. After initially stating that the document need not be turned over to defense counsel, the prosecutor replied that he would be happy to share his only copy with counsel. We believe this is all Rule 613(a) requires; the request was made, and after a moment of hesitation, the summary was turned over. Therefore, the trial justice was correct in his decision not to pass the case.

The defendant also contends that the following questioning of Gordon during cross-examination concerning an alleged conversation with Carol Larivierre Kane (Kane) was improper:

"PROSECUTOR: In March of 1988 when she [Kane] was interviewed at the Attorney General's Office, did you ask her to report back to you regarding the contents of the interview?

"GORDON: Never. I never asked anyone that was involved in this investigation to report anything to me at any time.

"PROSECUTOR: Were you at the bail hearing on June 14th of 1988?

"GORDON: Whose bail hearing?

PROSECUTOR: In this case. I'm sorry, June 14th of 1991?

"GORDON: Yes, I was.

"PROSECUTOR: And did you hear testimony on that day?

"DEFENSE COUNSEL: I object to that."

The objection was sustained. The next day defendant moved to pass the case asserting that the prosecutor asked the question " 'Were you at the bail hearing,' obviously to give the jury the implication, the idea that that's what was said at the bail hearing." In fact Kane testified at the bail hearing only that she called Gordon Tempest not that he had instructed her to call him. The prosecution responded that Kane had testified under oath to the *grand jury* that Gordon Tempest had "instructed her to report back to him after she spoke with Mr. Ryan at the Attorney General's Office." The prosecution also argued that Kane testified at defendant's bail hearing, at which Gordon was present. Therefore, the prosecution reasoned that

there was a "good faith basis" for the question.

The trial justice explained that the question created the impression that Kane so testified at the bail hearing and "that was not so." Consequently, when trial resumed, the court gave the following curative instruction:

"Ladies and gentlemen of the jury, during the cross examination of the witness Gordon Tempest yesterday afternoon * * * one of the prosecutors, asked Mr. Tempest if he had ever asked Carol Larivierre Kane to report back to him after she had spoken with the police about the Picard murder investigation. Mr. Tempest denied having done so. [The prosecutor] then asked Mr. Tempest if he had heard Mrs. Larivierre Kane testify at the bail hearing and the Court sustained an objection to that question. That question, while not answered, implied that Miss Larivierre Kane had in fact so testified at the bail hearing. The record of that bail hearing discloses that she did not say what was implied by the question put by [the prosecutor]."

■ We note initially that the trial justice sustained defendant's objection to the question before the witness answered. Although the question, within the context asked, tended to imply that Kane did in fact so testify at the bail hearing, we believe the trial justice's curative instructions were sufficient to remove any resulting prejudicial taint. In fact they created the impression that the state possessed no evidence to contradict Gordon. However, Kane's grand jury testimony directly contradicted Gordon.

■ We note that this is not a case wherein the prosecution "ask[ed] the accused a question that impli[ed] the existence of a prejudicial fact" and was not then "prepared to prove that fact." United States v. Silverstein, 737 F.2d 864, 868 (10th Cir.1984); see Byrnes, 433 A.2d at 677. Here the prosecutor had a good-faith basis to ask this question as the statement of Kane was made under oath to the grand jury. It appears, rather, that the prosecutor inadvertently referred to Kane's testimony as given at the bail hearing when in fact it was given to the grand jury. This mistake was as to the proceeding in which the statement was made not as to whether the statement was in fact ever made. Therefore, given the trial justice's curative instruction, we hold that the prosecutor's inadvertence is not of such "substantial magnitude" as to result in a denial of a defendant's right to due process and a fair trial. See Mastracchio, 612 A.2d at 703–04.

III

## THE CROSS-EXAMINATION OF DETECTIVE RONALD PENNINGTON

The defendant next asserts that his right to cross-examine Woonsocket Detective Ronald Pennington (Pennington) was abridged when the trial justice refused to allow counsel to inquire into Laferte's identification of her possible assailant. This restriction is alleged to be in violation of the Sixth and the Fourteenth Amendments. During direct examination, Laferte testified that she had no recollection of ever having identified any assailant. Apparently as a result of the assault, her ability to recall events, even subsequent to the attack, had substantially deteriorated. However, during her hospitalization Sergeant Donald Gosselin (Gosselin) of the Woonsocket police department had presented her with a list of names in an effort to determine who had beaten her. One such name to which Laferte nodded affirmatively was that of a man named Donald Dagesse, who defendant asserted was the perpetrator of the attack. Another, however, was Donald Duck.

This information was eventually relayed to Pennington via Gosselin, and an attempt was made to elicit it by means of defense counsel's cross-examination of Pennington. However, the trial justice restricted defense counsel's cross-examination, reasoning that Detective "Gosselin is going to have to come in. * * * [Laferte] said I don't even know that it took place. So now the only one who can adequately testify with any degree of reliability as to whether it did or did not take place is Gosselin." The defendant subsequently called Gosselin, who described questioning Laferte in the hospital.

■ It is well established that a trial justice has wide discretion in limiting cross-examination. *State v. Lamoureux,* 623 A.2d 9, 14 (R.I.1993). We shall not review this exercise of discretion "except for clear abuse, and then only when such abuse constitutes prejudicial error." *State v. Anthony,* 422 A.2d 921, 924 (R.I.1980). Clear abuse occurs when a defendant is "prohibited from engaging in otherwise appropriate cross-examination" in violation of his right to confront a witness. *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986); U.S. Const. Amend. VI; R.I. Const. art. 1, § 10. We are persuaded that the trial justice did not abuse his discretion in violation of defendant's right to confrontation when he restricted defense counsel's cross-examination of Pennington.

Pennington testified that he had no first-hand knowledge of Laferte's identifications. Any knowledge he possessed was passed on to him through Gosselin. Under Rule 602 of the Rhode Island Rules of Evidence, a witness clearly "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." This requirement was not met in the present case. *State v. Rice,* 633 A.2d 253, 254 (R.I.1993). Therefore, we hold that the trial justice did not commit an abuse of discretion amounting to prejudicial error by so limiting defendant's cross-examination. *Anthony,* 422 A.2d at 924.

## IV

## DETAILS OF THE CRIME APPEARING IN *THE WOONSOCKET CALL*

The defendant next claims that the trial justice committed reversible error by allowing Pennington to testify on redirect examination about details of the crime appearing in the *Woonsocket Call,* a local newspaper, allegedly "in violation of the rules against impermissible hearsay." During cross-examination of Pennington, defense counsel elicited the fact that Pennington made out a report concerning Darcy Authier (Authier) and her husband's receiving harassing phone calls from someone claiming in-depth knowledge of the manner in which the crime had been committed. The prosecution repeatedly objected during this questioning but was continually overruled, finally asking for a sidebar conference.

At sidebar the prosecution continued to press its hearsay objection. The trial justice disagreed, explaining that "its not being admitted for the truth of it" but rather to "indicate that someone had some knowledge" of the details of the crime. Although the trial justice stated that he would allow the evidence in during defendant's cross-examination of Pennington, he explained that he would permit the prosecution to clarify on redirect examination whatever is brought out during cross-examination. After the sidebar, Pennington testified that the report contained a paragraph not written by him stating "that there were details that these calls were of [such] a nature * * * that [they] would not be known to the general public." Furthermore, Pennington testified that Authier told him that the caller had stated that he had killed Picard with a sharpened tube and "had done such a good job they couldn't recognize her" when he finished and that the caller was harassing Authier because she knew Picard.

On redirect examination the prosecution introduced three articles from the *Woonsocket Call* containing details of the manner in which the crimes had been committed. It appears from the record that all three were published before the harassing phone calls began. In regard to the first article's introduction, the defense objected that Pennington was reading from a hearsay document. The trial justice responded, "Well, that's true, but its with regard to the common knowledge and statement made by the witness." Thereafter, there was no objection that any of the other subsequently introduced articles were hearsay.

■ It is well settled that a newspaper article is clearly inadmissible hearsay when it is offered to prove the truth of the matters contained therein. *State v. Damiano,* 587 A.2d 396, 398 (R.I.1991). However, otherwise inadmissible-hearsay evidence may become admissible when offered for another purpose, such as demonstrating that a specif-

ic person or witness possessed knowledge of a particular subject, event or condition. *See, e.g., In re Jean Marie W.,* 559 A.2d 625, 629 (R.I.1989) (expert testimony to the verbal and nonverbal conduct of child made during the course of play with anatomically correct doll admissible to show child victim's explicit sexual knowledge). In the present case the articles were admitted to demonstrate that certain details concerning the method by which the crimes were committed were public knowledge. Their sole purpose was to refute defense counsel's assertion, brought out through Pennington on cross-examination, that Authier's caller had knowledge not generally known to the public. It was this very basis, that is, to show what was public knowledge versus what Authier's caller knew, upon which the trial justice first allowed defense counsel to elicit from Pennington statements made to Authier by the caller. Therefore, we are persuaded that the trial justice did not err in admitting the articles in question.

## V

## ADMISSION OF ALLEGED "COVER UP" EVIDENCE

The defendant next contends that the trial justice repeatedly erred by admitting evidence of an alleged "cover up" of defendant's involvement in the crime by certain members of the Woonsocket police department and defendant's relatives. According to defendant, this evidence was never connected to him, was only "negligibly relevant," and as such was extremely and unfairly prejudicial to him. For the first time, defendant also argues that the evidence failed the more stringent balancing test applied to other-crimes evidence under Rule 404(b) of the Rhode Island Rules of Evidence. As a result of these admissions, defendant asserts that he was forced to try two cases: one for murder and the other for a "much contrived, unindicted obstruction of justice case."

This alleged cover-up evidence was brought out mainly through the prosecution's witnesses in its case in chief. During direct examination Detective Douglas Connell (Connell) of the Woonsocket police department testified that defendant's father, before retiring from the Woonsocket police department, had obtained the rank of Chief Inspector. The defendant objected on grounds of relevancy, prompting the following exchange between the trial justice and the prosecutor:

"THE COURT: Well, I don't know now the relevancy. He retired from the police department in '74. Is there going to be some tie in?

"PROSECUTOR: Yes, your Honor, I anticipate.

"THE COURT: All right. If you give me that assurance, fine. Otherwise I'll instruct the jury to disregard it. Go ahead."

When questioning resumed, Connell testified that upon retiring, Ray, Sr., was appointed the high sheriff of Providence County. Following this answer, the prosecution asked Connell to explain what the special-squad unit of the Woonsocket police department was to which he was assigned in February 1982. Defense counsel objected, requesting a sidebar during which he argued:

"[T]his goes directly to the motion in limine regarding the state producing evidence of activities in the Woonsocket Police Department that were improper, illegal, or whatever, and I press my motion in limine. That's what's happening here this morning, Judge. It has no relevancy to this case. It is prejudicial to my client and I object to it and I press my motion in limine."

The prosecutor responded that the evidence was very relevant to show what had happened at the crime scene and that it would eventually be tied in to defendant through the testimony of another witness. The trial justice eventually responded: "Well, I think you better put the witness on first because I'm not going to let this thing get all blown out of proportion and then if it doesn't fit in, have to grant a motion to pass." The sidebar ended with the prosecution withdrawing the question that prompted defense counsel's motion to pass.

Shortly after questioning resumed, defense counsel again objected, on the grounds of relevancy, to Connell's description of the crime scene as "the bulkhead was still open. There were people literally all over the

grounds and in and out of the house." During the ensuing colloquy with the prosecutor, the court asked "[w]hat has [this evidence] got to do with this charge against this defendant, unless you are going to tie [it] in with this defendant." The prosecutor again promised the court that the evidence would be subsequently connected. The court responded: "[w]hen you get it in then we'll build from there. We are not going to build down to it, then if we never get to it I have to strike all the evidence and perhaps consider a motion to pass." Consequently the objection was sustained.

Another objection as to relevancy was also sustained in regard to the interview of Sherri Richards by police. During the ensuing sidebar, the court again admonished the prosecution, "[W]e are not trying the Woonsocket Police Department. And unless there was some conduct here, cover-up, in connection with this defendant, then its totally irrelevant." The trial justice further explained:

"And the fact that somebody wasn't interviewed for a period of time, to me, and this is connected with the defendant, unless the defendant has some connection with it, I don't know what the relevancy is anymore than would be if Gordon burned any statements and said he never received them. You've got to tie it in and that's what I'm concerned about."

Following this exchange, defendant moved to pass after Connell explained that the department had cooperated with the State Police in reviewing all the statements and information the department had gathered in an effort to eliminate possible suspects. Defense counsel objected and moved to pass, stating that the impression created for the jury was that the police went through a process of elimination and came up with defendant and that he therefore must be guilty. The court disagreed stating that there was no basis to pass the case at this point. However, the court again expressed concern that

"[t]his is not a case of a cover up, its not a case of how bad or negligent the Woonsocket Police Department was, it's a case where this defendant is charged with murder. And the State has to prove those elements and they can't do it by default, by showing that there is a default on the part of the Woonsocket Police Department."

A few moments later defense counsel again moved to pass when Connell named the five members of the Woonsocket police department, including Gordon, interviewed by the State Police as part of their assistance with the ongoing investigation of the murder. At sidebar, defense counsel complained that the state was "trying to paint [defendant] with the brush of this so-called negligence or cover-up with the Woonsocket Police Department." The trial justice denied the motion and reiterated his earlier warning that "unless there is a connection made at the end of this case, I most certainly am going to grant the motion."

Following Connell's testimony, the state called Vaz, who testified that two days after the murder he had a conversation with defendant during which defendant stated, " 'My father won't get me out of this one.' " Vaz also stated that defendant gave a detailed description of his flight from the murder scene with Monteiro and Shaw. According to Vaz, defendant described how the three of them were screaming back and forth at each other in the car after leaving the murder scene when defendant stopped to call his father, Ray, Sr. After failing to reach his father, defendant called Gordon, who tracked their father down at the Gridiron Club along with Captain Francis J. Lynch (Lynch) of the Woonsocket police department. In the meantime, defendant had made contact with Gordon again, who informed defendant that Ray, Sr., and Lynch were on their way to the crime scene.

Upon arriving at the crime scene, Ray, Sr., parked across the street while Lynch entered the house, ordering everybody to come out. According to Vaz, defendant explained that Lynch wanted Gordon to go down into the basement to wipe fingerprints off the pipe while Lynch spoke to the officers on the scene. However, Gordon was unable to find the pipe. Whereupon, he walked back across the street to inform Ray, Sr., of his failure. Ray, Sr., called defendant to find out where the pipe was, in turn relaying defendant's information to Gordon; Gordon went back down into the cellar. Upon finding the pipe,

he wiped it clean and changed its location. In the days following the murder, according to the record, Gordon along with other Woonsocket police officers went back to the scene and retrieved the pipe.

The state also called Terrence Gelinas (Gelinas), who first arrived at the crime scene when police and rescue vehicles appeared. Gelinas testified that he noticed Ray, Sr., across the street from the crime scene an hour to an hour and a half after the attack. He further stated that in 1991 he had a conversation with defendant in which defendant told him that "[y]ou are going to wish you never got involved in this." The defendant continued, telling Gelinas that he was going to kill Pennington, who was heavily involved in the investigation, and that his father, Ray, Sr., was going to " 'take care of other people,' " including the prosecutor in this case. He continued, stating, " 'I wouldn't want to be you. I wouldn't want anybody to talk. Moe (Jalette of the Woonsocket police department) and Gordy are just waiting. * * * If I get convicted, my father is taking care of you.' "

The defendant also asserts that following the testimony of Vaz and Gelinas, improper evidence was also brought out through Michael Asselin (Asselin) and Bousquet. Asselin was a locksmith who, along with Robert Bosclair (Bosclair), installed deadbolts on the back and hall doors of the apartment house the morning after the murder. Asselin testified that two police officers were present while he was changing the locks. He later identified one of the two as Gordon. Bosclair testified that he saw the officers holding a pipe wrapped in a piece of cloth. Four days after this incident patrolman detective Richard Flood (Flood) and Gordon were part of a police detail assigned to look for the murder weapon that the Woonsocket police department still had not found. According to Flood, Gordon pointed out the pipe to him as the two walked through the house.

With reference to Bousquet, *see* discussion *infra,* defendant contends that testimony concerning the fact that Bousquet's tape-recorded statement was altered after it had been turned over by the Blackstone police to the Woonsocket police department was irrelevant and as such prejudicial. However, Bousquet also told of a conversation she overheard defendant having with her boyfriend Guarino wherein defendant admitted killing Picard and also stated that " 'his father had paid off a large sum of money to make sure that Beaver's name was never mentioned about this.' " According to Bousquet, defendant also stated that the murder weapon had been wiped clean and warned that " 'we [Guarino and Bousquet] better keep our mouths shut or we would be seriously injured.' "

Rivard was called by the state, *see* discussion *infra.* She described meeting defendant in January 1988 in a Blackstone bar. According to Rivard, the two consumed beer in the bar and snorted cocaine in the parking lot and then returned to Rivard's house where they continued snorting cocaine and drinking beer. During this time defendant unexpectedly asked Rivard, " 'Do you remember the girl that was killed in the basement in Woonsocket?' " She replied that she had. He responded, " 'I killed her.' " After a moment's pause he explained, " 'But I'll get away with it, I'm a Tempest, I'll slide.' "

At the close of the state's case in chief the trial justice denied defendant's motion to pass, stating:

"There was also a motion to pass the case because of a reference to a so-called cover up on the part of the Woonsocket Police Department. The defendant's position being that unless and until there was some connection made between the action of the Woonsocket Police Department, if it did amount to a cover up, that there had to be some connection between that action and the defendant. I'm satisfied that based on the evidence produced by the State that motion ought to and is denied and the defendant's objection to the Court's ruling is noted."

It is well settled that the admission or exclusion of evidence on the grounds of relevancy is soundly committed to the discretion of the trial justice. *State v. Neri,* 593 A.2d 953, 956 (R.I.1991). However, under Rule 403 of the Rhode Island Rules of Evidence, the trial justice may still exclude otherwise relevant evidence "if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See State v. Pratt*, 641 A.2d 732, 741 (R.I.1994). This court will not reverse the trial justice's determination unless it constitutes a clear abuse of discretion. *Cuddy v. Schiavonne*, 568 A.2d 1387, 1389 (R.I.1990). With these standards in mind, we hold that the trial justice did not commit an abuse of discretion in the instant case.

We note that the trial justice went to great lengths to protect defendant from the admission of irrelevant and marginally relevant evidence, always mindful of its potential prejudicial effect. He frequently sustained defendant's objections, refusing to allow the prosecution to bring such evidence before the jury unless and until it was connected to defendant. We note that the record is replete with the trial justice's inquiries into the prosecution of how and when this evidence would be tied to defendant and the trial justice's subsequent admonitions that defendant's motion to pass would be granted if the evidence was not deemed relevant.

■ It is significant that the state demonstrated through its witnesses not only that defendant had admitted his crimes but also how heavily he relied upon and actively participated in efforts by his father, brother, and their friends to conceal his involvement in the crime. Once defendant's reliance and willing participation was shown, evidence concerning witness intimidation, attempts to protect defendant from prosecution, and evidence tampering became highly probative despite being highly prejudicial. *See State v. Grundy*, 582 A.2d 1166, 1172 (R.I.1990) (evidence was highly probative despite being highly prejudicial to defendant). Although we agree with defendant that the Woonsocket police were not on trial, we believe that the trial justice did a yeoman-like job in carefully sifting through the voluminous testimony of this case, encompassing almost 2,200 pages of transcript and sixteen days of trial, in an effort to separate evidence that was highly probative with respect to defendant from that having little or no relevance. Therefore, given the connection the state established between this evidence and defen-

dant, we cannot say that the trial justice committed an abuse of discretion in denying defendant's motion to pass. *Ware*, 524 A.2d at 1112.

■ With respect to defendant's assertion that the admitted evidence failed the more stringent balancing test contained in Rule 404(b), we hold that this argument cannot now be brought before this court. As we have often stated, arguments on appeal that have not been adequately presented to the trial justice for his or her determination cannot be properly brought before us. *632 Metacom Associates v. Pub Dennis of Warren, Inc.*, 591 A.2d 379, 381 (R.I.1991). A thorough search of the record reveals no such presentation. Although defendant repeatedly objected to the evidence's admission on the grounds of relevance, he failed to bring any type of Rule 404(b) argument to the trial justice's attention for the justice's examination in connection with his objection.

## VI

### DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The defendant next challenges the trial justice's denial of his motions for a judgment of acquittal at both the close of the state's case and at the close of defendant's case. According to defendant, the trial justice erred in denying these motions because of a lack of evidence establishing defendant's presence at the murder scene as well as the state's failure to produce any physical evidence tying defendant to the murder.

■ In assessing a motion for judgment of acquittal, "a trial justice must determine whether the evidence offered by the state is capable of generating proof of guilt beyond a reasonable doubt." *State v. Caruolo*, 524 A.2d 575, 580–81 (R.I.1987); *see Pratt*, 641 A.2d at 743. In order to make this determination, this court, like the trial justice, "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable in-

ferences consistent with guilt." *Caruolo,* 524 A.2d at 581.

■ A review of the record reveals that the state produced Dr. Arthur Burns, who testified that Picard was unlawfully killed. He noted that the manner of Picard's death was homicide caused by repeated blows to the head with a blunt instrument. Additionally the state, through the testimony of numerous witnesses, connected defendant to the murder. Of particular interest to this court's examination is the testimony of Vaz, Bousquet, Guarino, Rivard, Richards, and LaDue. Vaz, Bousquet, Guarino and Richards testified that defendant admitted to them that he killed Picard. Through their testimony a fairly detailed account of defendant's attacks on Laferte and Picard emerged.

Furthermore, Richards testified that defendant was in a huge maroon, four-door car shortly after the murder and that he had a bite or scratch mark on one of his hands. LaDue testified that a big maroon four-door car was at the scene of the murder when she arrived home but was missing a short while later. We are of the opinion that without weighing the credibility of the state's witnesses or the evidence produced and drawing therefrom all reasonable inferences of guilt, the trial justice did not err in finding the evidence produced at trial sufficient to prove guilt beyond a reasonable doubt.

## VII

## DEFENDANT'S MOTION FOR NEW TRIAL

In the final issue raised on appeal, defendant challenges the trial justice's denial of his motion for new trial. He contends that no connection was established between himself and any physical evidence and that the testimony of the state's key witnesses was contradictory and not credible. Given these alleged errors, defendant believes the following: the verdict was against the weight of the evidence, the evidence preponderates in favor of the innocence of defendant and much against his guilt, the verdict was contrary to the evidence and the law of the case, and the verdict did not do substantial justice.

In beginning his analysis of defendant's new-trial motion, the trial justice set forth the applicable standards by which he, as a trial justice, must abide in considering defendant's motion for a new trial. Following this recitation, he explained that the state had adequately proved the corpus delicti, as well as defendant's presence at the scene of the murder shortly before its occurrence. In determining defendant's participation in the crime, the trial justice carefully and separately assessed the following witnesses' testimony: Guarino, Bousquet, Vaz, Rivard, and Gelinas. At the close of his assessment, the trial justice echoed the prosecutor's closing argument that it would be "somewhat bizarre" for all these witnesses to come forward and "say the Defendant told them all these things." The trial justice further reasoned that, given their testimony and all the supporting testimony,

> "there certainly was more than sufficient evidence here upon which [the jury] could rely and upon which [the jury] could decide beyond a reasonable doubt that this Defendant did commit the crime. It's odd when one reflects upon the statements, but his statements are the only statements that explain how these two women were found to be in the basement unless someone was there."

He also pointed out that the jurors returned a verdict of murder in the second degree, which showed how very conscientious they were in sifting through the evidence and the instructions given to them. The trial justice concluded, upon a review of the evidence and the law, that the verdict was not against the weight of the evidence as it was presented to him and as he perceived it.

The trial justice next turned to defendant's contention that the evidence preponderates in favor of the innocence of defendant and against his guilt. The trial justice noted that this court has rejected the reasonable-hypothesis rule. He stated that he was "satisfied here that this jury drew the reasonable inferences that it was permitted to draw and drew those inferences in favor of guilt of the Defendant from all of the evidence that it had before them."

The trial justice then turned to defendant's allegation that the verdict was contrary to the evidence and law in the case. In regard to the allegation that the verdict was contrary to the evidence, he noted that he had already covered that issue in dealing with the previous two arguments. Additionally, the trial justice believed that he properly instructed the jurors and that they in turn properly applied those instructions to the facts adduced during trial. Therefore, the verdict was contrary neither to the law given to the jury nor to the evidence adduced.

Finally, the trial justice noted that he was satisfied that substantial justice had been done, noting that "the jury had before them * * * a reasonable-minds-could-differ situation." This, he stated was all that the law required.

The court finished by denying defendant's motion for a new trial, commenting on the credibility of the witnesses:

"[T]his Court is satisfied that with regard to those witnesses that I found to be more pertinent than others as to the relevant issues here, as to Carol Laferte, Louise Kearns, Sherri Richard[s], John Guarino, Donna Bousquet, Ronald Vaz, Loretta Rivard, Terrence Gelinas, Dr. Burns, and Dr. Sammartino I'm satisfied that each told the truth as far as each believed the truth to be. * * * I'm satisfied here that while there have been inconsistencies in some of the testimony and while maybe some of these witnesses did not recite and recall everything that had been said on a previous occasion, the Court must take the witnesses as they come."

▪ We note that "[a] trial justice may grant the new-trial motion if, relying on his or her independent assessment of the weight and the credibility of the evidence, he or she determines that the verdict is against the preponderance of the evidence." *State v. Bleau*, 649 A.2d 215, 219 (R.I.1994) (quoting *State v. Mercado*, 635 A.2d 260, 265 (R.I. 1993)). "If, however, a trial justice agrees with the verdict or determines that reasonable minds could fairly come to different conclusions, then the new-trial motion must be denied." *Id.* We shall not reverse a trial justice's determination when the facts relied upon by the justice are clearly articulated unless the decision "overlooked or misconceived material evidence relating to a critical issue or was otherwise clearly wrong." *Caruolo*, 524 A.2d at 585. In the instant case we are persuaded that the trial justice applied the correct standards in his denial of defendant's motion for a new trial.

The trial justice determined that this was a situation wherein reasonable minds could come to different conclusions. He carefully articulated the facts in his ruling and made a thorough assessment of the testimony of the key witnesses. Additionally he met defendant's major contention that the state's witnesses were contradictory and not credible. In passing upon their credibility, the trial justice explained:

"We didn't have a parade of MDs or Summa Cum Laudes here. We had people who deal in drugs, we have people who snort drugs and matters of that nature. And so when you deal with that kind of an element, one must expect that kind of an element to come forward. So we don't expect total intelligence here. We look for honesty and we look for good faith and we look for what we hope is truth. I'm satisfied that each of these witnesses came here and said what they said, recalling and believing it to be the truth. So accordingly, I accept their testimony in that light as truthful."

He explained further that even though the testimony of the state's key witnesses contained minor contradictions, their testimony "was totally truthful on those matters that were relevant and pertinent to the charge made against the defendant." Therefore, he reasoned, "this jury could accept their testimony and find it credible." We are of the opinion that in so ruling, the trial justice did not overlook or misconceive any material evidence, nor was he otherwise clearly wrong. Therefore, defendant's appeal on this ground must fail.

The defendant further contends that in ruling on his motion for new trial, the trial justice committed constitutional error. According to defendant, this occurred when the trial justice impermissibly took into account

defendant's failure to testify in denying the motion. The error alleged arose during defense counsel's argument in support of his new-trial motion that certain witnesses connecting defendant to the crime were not credible. During a colloquy with defense counsel the trial justice remarked:

"So in essence *in recognizing and acknowledging the Defendant's right not to testify,* all of that evidence [concerning defendant's admissions] is really uncontradicted except where its inconsistent with statements previously given. It's a harsh realization, but that's what it boils down to. Here's a Defendant who is alleged to have said things by four people, and there's no denial by him. He doesn't have to deny it, but that doesn't detract from the fact that the final result is really uncontradicted testimony.

"COUNSEL: Well, your Honor, I don't agree with that.

"THE COURT: When I say uncontradicted, I don't mean uncontradicted in that broad sense because actually if the witnesses said something different on a previous occasion, that's substantive evidence under our rules.

"COUNSEL: I agree.

"THE COURT: And it must be considered, and I'm certain it was considered by the jury. But looking at it in that context, its easy to say 'Well all these people said the Defendant said this.' But when you look at it as the jury looks at it, there's no one saying, 'I didn't say it.' He doesn't have to say that that's true. That's true, he doesn't have to. No one can fault him for not having said it. But one must look at the reality of the situation. And, as the evidence sits there in the jury's lap, it's contradicted only by whatever inconsistencies the jury can find in the testimony." (Emphasis added.)

■ It is well settled that a defendant in a criminal case need not testify on his or her own behalf. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The jury may draw no adverse inferences from a defendant's exercise of this privilege. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Simpson,* 595

A.2d 803, 805 (R.I.1991). Furthermore, this Fifth Amendment privilege clearly prohibits a trial justice from making any adverse comment to the jury concerning an accused's right not to testify. *State v. Gibbons,* 418 A.2d 830, 835 (R.I.1980). Although this privilege may provide refuge for the guilty, it is deemed to be indispensable to notions of fundamental fairness. *See Carter v. Kentucky,* 450 U.S. 288, 299, 101 S.Ct. 1112, 1118, 67 L.Ed.2d 241, 250 (1981). However, in the instant case we are persuaded that defendant's Fifth Amendment privilege has not been abridged.

We note that the trial justice's remarks were not made in the presence of the jury. *Cf. Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (trial court stated that jurors may draw adverse inference from defendant's failure to testify on the issue of guilt). In fact, the trial justice had already instructed the jurors cautioning them that no inference could be drawn from defendant's failure to testify. At the time of the remarks the jury had already returned its verdict. These remarks, rather, were made in the course of an exchange with defense counsel during counsel's argument in support of his motion for new trial. Shortly after this exchange the prosecution argued in opposition to the motion. It was following the prosecution's argument that the trial justice began his analysis of defendant's motion: he set forth the applicable standards, assessed the credibility of the witnesses, and carefully responded to defendant's assertions. Nowhere during this subsequent analysis did the trial justice actually draw the negative inference that because defendant had failed to testify, he was therefore guilty or that this failure somehow cast a pall on his innocence.

We believe that the trial justice's remarks were not of the nature to impermissibly effect or color his analysis in denying the defendant's motion. Instead, his comments, viewed in their context, were a very candid assessment to defense counsel that the defendant's admissions, brought out through the state's witnesses, remained uncontradicted except for any inconsistencies that could be found in their testimony. Throughout the remarks at issue, the trial justice continually

reiterated that the defendant had the right not to testify and was under no compulsion to take the stand to refute or to contradict the witnesses' testimony. However, the defendant's Fifth Amendment privilege did nothing to detract from the fact that no witness, or other evidence, refuted or materially contradicted these admissions. Taking all this into account, we are of the opinion that the trial justice's comments, when viewed in the context made, did not deprive the defendant of his Fifth Amendment privilege.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.