**STATE**

v.

**William MANIATIS.**

No. 93–225–C.A.

Supreme Court of Rhode Island.

April 18, 1995.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Ronald L. Bonin, Moretti & Perlow, Cranston, Richard Casparian, Public Defender, Janice Weisfeld, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter came before the Supreme Court on the appeal of the defendant, William Maniatis (Maniatis), from a conviction following a jury trial in Superior Court of first-degree sexual assault and five counts of second-degree sexual assault. For the reasons that follow we affirm.

The victims in this case were teenaged girls who worked at Kitchen 44, a restaurant defendant and his wife owned and had operated since 1987, located on Route 44 in Glocester, Rhode Island. In addition to operating his own glass installation business, prior to trial, defendant was a constant fixture at Kitchen 44, where his wife managed the restaurant and defendant himself pitched in as a maintenance worker, Friday-night cook, and general all-around helper. Many of defendant's relatives worked at the family restaurant as well as defendant's three children. It was here at Kitchen 44 that all the second-degree sexual assaults occurred. The first-degree sexual assault took place inside the premises of a second restaurant, the Rocking Horse Tavern, also located in Glocester on Route 44, that defendant and his wife purchased in 1990.

The defendant was charged with committing various forms of sexual assault upon six young girls employed at Kitchen 44 and was convicted of sexually assaulting four of the girls who worked at this restaurant between 1988 and 1990. The record reveals a similar pattern or scheme was employed by defendant in all the assaults. At the outset, defendant would tickle the girls. Then, when he was alone with them, he would forcibly touch them on the outside of their clothing on their breasts or in their vaginal areas. The more isolated the victim, the more forceful and physical defendant became. Some of the girls were assaulted in a shed on the premises, others in the kitchen, another in the restaurant's parking lot. All victims were employees of Kitchen 44 at the time as either waitresses or kitchen personnel. All assaults at Kitchen 44 occurred when other employees were present and sometimes able to witness some of the assaults.

Barbara was sixteen years old when she started working at Kitchen 44 in the summer of 1988.[1] This witness testified that she was never alone with defendant until one particular evening in December of that year when she was getting ready to leave work. Because her car had been giving her trouble, Barbara attempted to start it and let it warm up before she left the parking lot. She left her apron, her coat and her pocketbook in the restaurant when she went outside to start the car, which then would not start. She then got out of her car and lifted up the hood to attempt to solve the problem. At this point, defendant suddenly appeared behind her and began "tickling underneath [her] arms," then "started to move his hands." Barbara had not seen Maniatis before he came up behind her while she was peering under the hood of her car. Obviously not in a position to defend herself, the

---

[1]. We have used fictitious names for all of the victims and witnesses in this case because at the time of the incidents these people were minors.

victim tried to back away but "[h]e was holding [her] forcefully" and she "couldn't move."

Barbara testified that "at first when he started tickling me, I was laughing because I was nervous. I was, like, why is he doing this to me? I tried to back away, and he had me, then he grabbed my chest, and then I—you know, was trying to move away more, then he grabbed my vagina." He gripped her with his left hand while his right hand "[g]roped, squeezed, touched" her breast. She was "getting really scared" and struggled with defendant in an effort to break free, but he gripped her tightly and "moved his hand down and started grabbing" at her genital area. She testified that she felt he was pulling her away from the restaurant toward the shed or perhaps the nearby woods. Fortunately, she was able finally to break free and run into the restaurant whereupon she retrieved her coat and pocketbook and immediately left. She never went back to work there.

Barbara told defendant's wife that her reason for not returning to Kitchen 44 was only that "the hours were too much." She came forward to testify at defendant's trial on her own initiative because when she heard that defendant had been arrested for first-degree sexual assault, she "felt guilty * * * because [she] felt [she] should have said something to somebody earlier and maybe it wouldn't have happened."

The next incident involved a second-degree sexual assault upon a fifteen-year-old waitress who was employed at defendant's restaurant and whom we shall call Penelope. This incident occurred sometime between August 1988 and August 1990. A male employee who worked in the kitchen at Kitchen 44 in 1988 testified that he was walking to his car behind the restaurant at dusk when he saw Penelope "up against a freezer in the food shed" "trying her best to get away" as defendant held her and "was attempting to put his hand underneath her apron front and down her pants." When defendant saw this male employee "he stopped doing what he was doing" and Penelope "got away instantly."

Once they were both back inside the restaurant, this employee asked Penelope if she was all right and Penelope responded that "[s]he felt she could control it. It wouldn't happen again." Neither Penelope nor this employee reported the incident.

This particular male employee testified that there were "a lot of occasions where [Maniatis] would make contact with [Penelope] and other waitresses. It was * * * common practice. After a while, you didn't notice it anymore, it was so common." He testified that "[h]e would put his arm around the girls, you know, acting like he would be their friend, and he would grab them." It was so common, this witness testified, that "[t]here was one every night that he had touched in some way." This witness culminated his testimony by declaring that he had once heard defendant's son, who was also working at the restaurant, say, "[K]eep it up, Dad, I'm going to tell Mom." The defendant's son denied this statement at trial. However, Penelope testified that she was the one whom defendant "grabbed" when his son "told him if he didn't knock it off he was going to tell mom."

The next prosecution witness was a fifteen-year-old male employee at Kitchen 44 who started working there under the previous ownership and was the only help there when the Maniatises bought the place in May of 1987. He was kept on and worked at Kitchen 44 continuously as a short-order cook until November 1990 when defendant learned that the young man had testified before the grand jury. This young man was the only prosecution witness who knew all the victims and was able to confirm a number of incidents involving defendant.

He testified that on one evening after the restaurant had closed, he and Maniatis and another waitress, Hope, were the only persons there. As his testimony recounted, he was cleaning up in another part of the restaurant when he heard Hope call his name from the restroom. It was a "frantic call," and as he went toward the restroom, he found Hope against the wall "with a weird look on her face like something had happened."

Hope testified that she was cleaning the restroom that evening when Maniatis came

in and began to talk to her. She finished her chores and as they "both walked out together," Maniatis suddenly "pinned [her] up against the door and put one hand on [her] breast and one on [her] vagina and was just moving it around." Hope was fifteen years old at the time of this incident. She immediately attempted "to move away and [was] screaming for [her co-worker]," but apparently he did not hear her right away. Hope testified that it "[m]ust have been three minutes" before he responded to her cries for help. When the young man went to the restroom in response to her plea for help, he saw Hope backed up against a wall with defendant just standing there. As Hope testified, "[I]t stopped when [he] got there." Hope just walked away from the restroom and defendant but told her co-worker "never to leave [her] alone with him again." She never told her parents or anybody else. She was too afraid.

Leslie, the next victim, was fifteen years old when she started working at Kitchen 44 in April of 1989. She testified that one night she went by herself to the food shed, a building located about thirty feet from the restaurant where food supplies were kept, to retrieve some supplies and suddenly discovered Maniatis behind her. The defendant asked her if she was "ticklish," to which she replied she was not. The defendant "proceeded to tickle" her without her permission. Leslie testified that "he was behind me with his arms around me, and he was tickling me around my stomach area and, also, he went up towards my breasts and touched them." Leslie "commanded him to stop" and attempted to "move his hands away," but Maniatis continued to tickle her and "tried to go down towards" her vaginal area. Leslie further testified that she "crouched over and just told him to stop and then [she] just somehow pulled away and just walked out of the shed." This incident, like the previous ones, also went unreported. Leslie testified that she was too scared to tell anyone.

The first-degree sexual assault upon Penelope occurred on August 10, 1990, and was the only assault that did not take place at Kitchen 44. This assault occurred at the Rocking Horse Tavern, a building located nearby, which defendant and his wife had recently purchased and were in the process of converting into a second restaurant. The only people present at this location when the sexual assault took place were defendant and the victim, who was seventeen years old at the time of this assault. As indicated, defendant had sexually assaulted Penelope two years earlier at the Kitchen 44 location. Here, at the Rocking Horse Tavern, defendant lured Penelope to this isolated location and proceeded forcibly to perform digital and penile vaginal intercourse upon her.

Penelope was now seventeen years old and had been working at Kitchen 44 for approximately two years when on the night of August 10, 1990, according to her testimony, Maniatis "raped" her. She testified to continual sexual harassment and assault all the time she had worked for the Maniatises. Recounting Maniatis's sexual advances toward her during her two-year employment at his restaurant, Penelope testified that he "would make passes at me, sexual advances"; "[h]e would grab my butt, bump into me, accidentally hit my breast or he'd say things." Maniatis would tell her that "we could go out, we should have an affair." The defendant even offered to pay her $300 "to sleep with him." He would follow Penelope to the supply shed quite often and, once inside, he "would grab at [her] and paw at [her]." Maniatis was relentless in making these sexual overtures to her.

Penelope "would push him away and tell him to stop" or would tell him that she "would quit if he didn't knock it off and usually that would do it for then." Penelope's exhortations would often lead to a brief cessation and the sexual propositions would stop for a while. But the harassment always resumed.

Penelope had told a few coworkers "that he [Maniatis] would make me feel uncomfortable, that he was making passes at me, and they said they'd look out for me if I had to go into the shed"; "[t]hey would kind of rescue me if he followed me out there." Penelope did not quit her job at Kitchen 44 because she and her family were in dire financial straits and her income from the restaurant amounted to a family necessity. When she

finally did tell her parents that her boss "was hitting on her," her mother later acknowledged, they did not encourage her to quit her job, but took their daughter's word that she "could deal with it."

On the night of August 10, 1990, at the end of her work shift, Penelope testified that Maniatis asked her if she "wanted to go up and see the progress on the new restaurant [the Rocking Horse Tavern] because it should be opening soon." Penelope was "interested in seeing how it was coming along," but specifically asked "if anyone else was going to be up there" "because [she] didn't want to stay with him alone." Maniatis assured her that his wife and children would be there. Penelope walked in through a back door and found Maniatis there alone. She asked if his wife and children "were coming, and he said, yeah, that they were coming." Maniatis began to show her around the new place. It had only been a few minutes since Penelope had arrived, and once she took a quick look around, she told Maniatis that it "looked nice" but "that [she] had to go."

At this point Maniatis asked Penelope to "just come over here and look at this last thing." Penelope obliged and followed him as he walked down a small hallway. They reached an open door in the hallway that was the entry to a small, unlighted utility room. As Penelope looked in, Maniatis pushed her into the room and trapped her in a corner with her face against the wall and unzipped her pants. Penelope was "crying, telling him to stop, trying to get away" but Maniatis pushed her to the floor and pulled her pants down. He first masturbated over her, then penetrated her vagina with his fingers, and finally used his penis. After ejaculating, Maniatis left the room and Penelope dressed, got into her car, and left. She never went back to the restaurant.

Penelope drove directly to her boyfriend Peter's apartment after leaving the Rocking Horse Tavern. Peter was only a few weeks older than Penelope. They had known each other since they were ten years old. Peter testified that on the night of August 10, 1990, Penelope drove into the driveway where his apartment was located "[a]round tenish," "very upset" and "crying." He further testi-

fied that she "seemed zoned out and in her [own] little world," "[s]he wasn't the same."

Peter was living with a friend, Paul at the time, and, when Penelope arrived, Peter and Paul realized that something had happened to her. Peter inquired as to what happened and Penelope told him that Maniatis "had bothered her at work and had hit on her." Eventually Penelope told Peter she had been raped by Maniatis. She was obviously still very emotional and made Peter promise not to tell anyone. About fifteen minutes after arriving, Penelope drove home, leaving Peter alone.

Testimony was offered about interaction the next day among Penelope, her sister, and Peter, and eventually Penelope's sister told their mother that Penelope had been raped. The disclosure came on the morning of August 12, 1990.

After trial Maniatis was found guilty of the first-degree sexual assault upon Penelope and of five counts of second-degree sexual assault, two upon Penelope, and one each upon Leslie, Hope, and Barbara. A verdict of not guilty was returned on a sixth count of second-degree sexual assault upon another teenaged girl who had also waitressed at Kitchen 44. The defendant received concurrent sentences of thirty years' imprisonment for the first-degree sexual assault, fifteen to be served and fifteen suspended, with fifteen years' probation to commence upon release. In addition, defendant received fifteen years' imprisonment for each second-degree conviction, seven years to be served and eight suspended, with eight years' probation to commence upon release.

I

The defendant's first issue on appeal concerns the refusal of the trial justice to permit the defense to attempt to impeach the credibility of Penelope's boyfriend, Peter, who had turned nineteen the week before trial, by introducing his juvenile record. That record contained three juvenile adjudications and a more recent adjudication, apparently as an adult. All adjudications resulted in sentences of probation only. After some discussion, the trial justice decided to suppress

these adjudications and ruled that Peter's juvenile record would not be admitted.

 We conclude that it was not reversible error to refuse to allow impeachment of this prosecution witness's credibility through the use of a record of juvenile adjudications that were not convictions. In our opinion, defendant's reliance on *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is misplaced. In that case, the defendant notes that the Supreme Court of the United States held that the defense should have been able to cross-examine the state's witness about his juvenile record as a means of exposing motive or bias in how he answered police questioning and what he testified to at trial. *Davis* involved a crucial witness for the prosecution near whose house a safe stolen in a burglary had been found. During cross-examination this witness admitted that it had crossed his mind that police might have thought he had something to do with the burglary, *id.* at 313, 94 S.Ct. at 1108–09, 39 L.Ed.2d at 351–52, but "[s]ince defense counsel was prohibited from making inquiry" about his probation for two other burglaries, "[his] protestations of unconcern over possible police suspicion that he might have had a part in the * * * burglary" went unchallenged. *Id.* at 313–14, 94 S.Ct. at 1109, 39 L.Ed.2d at 352.

Unlike that prosecution witness, Peter was never a suspect in any crimes on trial in the instant case, nor had he any reason to believe that he might be. Moreover, Peter was not a crucial witness for the prosecution. In *Davis,* that prosecution witness was crucial. Peter's knowledge of pertinent events was very limited. Unlike the prosecution witness in *Davis,* Peter could not "have made a hasty and faulty identification" in order "to shift suspicion away from himself," *Davis,* 415 U.S. at 311, 94 S.Ct. at 1108, 39 L.Ed.2d at 351, nor could he have "been subject to undue pressure from the police and made his identifications under fear of possible probation revocation." *Id.* In *Davis,* "defense counsel sought to show the existence of possible bias and prejudice of [the prosecution witness], causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identifi-

cation." *Id.* at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. In the instant case no such possibility existed.

In *Davis* the witness's juvenile adjudication was not used as a general impeachment of that witness's character as a truthful person. It was introduced by the defense only to probe the witness for bias and prejudice. No such situation existed in this case. Peter made no statement at trial that could have been impeached by evidence that he was on probation or had a juvenile record. The defendant's attempt to bring this issue under *Davis* by claiming trial counsel sought to use the evidence of Peter's probation for bias or motive impeachment and not for general credibility impeachment fails to convince us otherwise.

At no point during trial was the court informed that through the use of the witness's juvenile record defense counsel was seeking to show the existence of possible bias and prejudice on the part of the witness. Clearly this omission on defendant's part was not due to a "novel rule of law." *State v. Rupert,* 649 A.2d 1013, 1016 (R.I.1994). Our review of the ruling is limited to the basis on which the issue was argued below. It is pertinent to note that defendant concedes on appeal that "defense counsel was not verbose" in stating the purpose for which he sought to use the juvenile record. The defendant's attempt to avoid the threshold obstacle of preservation by arguing that defense counsel's "reasoning" for doing so was nevertheless "quite apparent" is of no avail.

 The defendant erroneously relies on subsections (a) and (b) of Rule 609 of the Rhode Island Rules of Evidence to bolster his argument that this evidence is admissible. Citing *State v. Simpson,* 606 A.2d 677 (R.I. 1992), defendant twice asserts that convictions are "presumptively admissible" under Rule 609 and he quotes verbatim Rule 609(a) for an argument that the state "failed to meet its burden [to] prove" these records "were inadmissible for traditional credibility impeachment under Rhode Island Rule of Evidence 609."

The fact is that Peter's juvenile adjudications were not admissible under Rule 609(d)

under the Rhode Island Rules of Evidence to impeach his general credibility as a witness. Rule 609(d) states:

"Impeachment by evidence of conviction of crime. * * * (d) *Juvenile Adjudications.* Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence."

This subsection vests discretion in the court to allow evidence of juvenile adjudications of a witness other than the accused *"if* conviction of the offense would be admissible to attack the credibility of an adult *and* the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." (Emphasis added.) *Id.* The defendant asserts that juvenile adjudications are presumptively admissible unless the state meets its burden to prove they were inadmissible. This interpretation of Rule 609(d) is not correct. The defendant misconstrues the clear language of Rule 609(d), which, in fact, states the converse of what he interprets. Rule 609(d) is crystal clear: evidence of juvenile adjudications is not admissible unless it would be admissible to attack the credibility of an adult under Rule 609(a) and the court is satisfied that that admission is necessary for a fair determination of the issue of guilt or innocence. The trial justice's determination to exclude this evidence was quite correct.

## II

The defendant next asserts that it was reversible error for the trial justice to refuse to admit as a physical exhibit the statement written by Rhode Island State Trooper Mark Bilodeau (Bilodeau) as a means of impeaching the trial testimony of Penelope and Peter. Bilodeau testified for the defense and was examined in detail about the circumstances in which he took information from Penelope. Her statement was taken when she first went to the Chepachet State Police

barracks in Glocester with Peter during the late evening of August 18, 1990. Penelope stated at the time that she wanted "to file a rape complaint." Bilodeau testified that after taking the information from Penelope, he contacted then-Corporal Detective Kidd (Kidd). He then typed the complaint report himself from his notes. This complaint report stated that Penelope "did not tell anyone" about the rape "right away" but told her boyfriend "and also her sister" two days later, on Sunday, August 12, 1990. Bilodeau testified that this was his present recollection after refreshing his memory from his report. The defendant argues that since Penelope had told Peter of the assault on the night it occurred, August 10, 1990, which was contrary to the report by Bilodeau, that therefore the State Police report itself should have been admitted into evidence to impeach the trial testimony of Penelope and Peter.

Defense counsel moved to admit Bilodeau's report as a full exhibit along with the typed report by Kidd that was prepared the day after his interview with Penelope. The defendant moved to admit them as normal records kept in the ordinary course of business under Rule 803(6) of the Rhode Island Rules of Evidence as substantive evidence of a prior inconsistent statement and as past recollection recorded.

In denying the motion to admit the reports into evidence, the trial justice correctly stated that "[f]irst of all, the best evidence is that which is testified to from the recollection of the person giving the testimony." Bilodeau only had to refresh his memory "sparingly," the trial justice noted in his ruling, in order to testify to the points that counsel was trying to raise in his examination. Having so noted, the trial justice ruled that admission of the reports themselves would not "add anything to the jury beyond what they already heard through the direct testimony of the witnesses." We agree with the reasoning of the trial justice when he denied defendant's renewed motion to admit the two reports as full exhibits at the close of all the evidence.

"Well, there is no question that we had a full examinatio[n] of the content of both of these documents on the record from the

persons who created the documents and also from the persons who gave the statements. The only important feature, of each of the documents is the difference in time during which the alleged victim * * * says that she contacted and involved her boyfriend of this incident. The jury has heard her version, heard the boyfriend's version, heard Officer Bilodeau, and I don't think anything further is required. If nothing else it would be cumulative but the appropriate qualifications haven't been made to the court. I'm not inclined to admit them."

On appeal, defendant only contests the ruling excluding Bilodeau's report. He declares this report was the "only unequivocal, direct evidence that [Penelope] did not tell anyone that she had been raped until two days had elapsed."

■ Bilodeau's report merely reported the recollection of another concerning what was told to him. It is clear that neither Bilodeau nor his report could provide "unequivocal, direct evidence" of the fact of when Penelope told "anyone" she was raped as he himself had no knowledge of this incident. He could only testify that, as he recalled, Penelope told him something different when she came to the police barracks eight days after the rape had occurred to file the complaint. Simply stated, Bilodeau's report did not qualify for admission under the hearsay exception of Rule 803(6) for business records.

■ The defendant next claims the report should have been admitted under Rule 801(d)(1)(A) as substantive evidence of an inconsistent prior statement by Penelope. Initially the determination of whether a statement is in fact inconsistent with the declarant's in-court testimony is a matter within the province of the trial justice. *State v. Pusyka*, 592 A.2d 850, 853 (R.I.1991). In the instant case it could not be reliably determined whether Penelope actually stated what Bilodeau attributed to her or whether the trooper simply was mistaken. The trial justice correctly permitted the defense to explore these purported discrepancies but determined that admission of the report itself would only be cumulative.

■ The defendant is mistaken in his belief that because evidence of a prior inconsistent statement can now be admitted under Rule 801(d)(1)(A) not only to impeach the credibility of the declarant, or the reliability of his present account, but also for whatever weight the jury may give it as evidence of the truth of his earlier account, it is error not to admit the statement substantively if the declarant testifies.

Introduction of a statement as substantive evidence does not mean admission of the physical paper itself. A statement is admitted substantively when a witness testifies to it without an instruction limiting the purpose for which the jury can consider it. *See State v. Issac*, 477 A.2d 62, 66 (R.I.1984) (stating former rule that since "[p]rior inconsistent statements are admissible not for their substantive or independent testimonial value but only for the purpose of impeaching or neutralizing at trial testimony," and "the trial justice is required to give a limiting instruction to the effect that the prior inconsistent statement can be considered by the jury not for its substantive content but only for evaluating the witness's credibility").

It is not enough that a statement be inconsistent to be substantively admissible under Rule 801(d)(1)(A). For instance, in order to be admitted for the purpose of proving a fact in issue, the fact in issue must be *relevant*. If the actual truth or falsity of the statement has no independent relevance, it is not admissible if its alleged making is merely offered to impeach the declarant's credibility. Here, the fact placed in issue by Bilodeau's report was whether Penelope told her boyfriend, Peter, of her rape the night it happened *or* two days later. It is quite apparent that whether she told Peter of the rape on the tenth of August or the twelfth has absolutely no bearing on whether defendant committed the sexual assault. This fact was not relevant and, therefore, was not admissible substantively.

### III

■ The defendant next claims that the trial justice erred in declining to instruct the jury, as requested, that in evaluating the victims' credibility, it could consider their

failure "to report the alleged unlawful activity to persons you would normally expect them to tell." On appeal, defendant asserts that this omission operated to deny him a fundamentally fair trial. The defendant's appeal on this ground is entirely without merit.

The failure of a victim of a sex crime "to make a prompt and reasonable outcry" has not been found to raise any true question about its actual occurrence. The defendant would have us believe otherwise. On the contrary, recent statistics demonstrate that victims of sexual assaults, particularly by an acquaintance, are loathe to report the crime to anyone. "In the absence of a judicial determination of the relevance of evidence of an individual victim's prior silence or delay, it is incorrect to assume that such evidence is probative of a consequential fact, such as the witness' credibility." *A Matter of Time: Evidence of a Victim's Prompt Complaint in New York,* 53 Brook. L.Rev. 1087, 1107 (1988). It is not surprising to this court that these young victims, none older than seventeen, who had all known defendant and his wife to be figures generally liked and respected in the community where they all lived, would not have immediately reported or were initially reluctant to report defendant's touching and harassment of them to his wife or to the authorities.

This court has "repeatedly stressed that a trial justice is obligated to avoid expressing any opinion about the weight of the evidence or the credibility of witnesses as long as the case is before the jury." *State v. Farlett,* 490 A.2d 52, 56 (R.I.1985). The trial justice's rejection of defendant's requested instruction was clearly correct.

## IV

The defendant's last issue on appeal concerns the denial of his motion to reduce his sentence. In moving for a reduction of his sentence under Rule 35 of the Superior Court Rules of Criminal Procedure, defendant argued that the sentence imposed was excessive and harsh when compared to those of other first-time offenders for similar crimes. In denying defendant's motion, the trial justice had recognized that defendant's family was "devastated by the conviction of their husband and father" but found them to be interested parties in the case. He flatly stated he did not believe their testimony supporting defendant's alibi for the evening of August 10, 1990. Further, the trial justice also stated he did not believe the testimony of defendant himself, who he noted "has dispassionately disavowed any involvement with any of these youngsters" and "denied making any references at any time with any off-color remarks or remarks of a sexual nature to any of the young women who worked in his restaurant over that three or four year period." The defendant's testimony was clearly and totally inconsistent with a "plethora of evidence from otherwise credible young people." The trial justice declared that "[t]here is not a thread or scintilla of evidence on this record to indicate any type of conspiracy against this defendant as perpetrated by these youngsters" that would "give any credence" to the stand taken by the defense. We agree.

■ The defendant's sentence is arguably long but not excessive given the facts and circumstances. The convictions in this case are, without question, convictions of serious crimes. The defendant, an adult male of almost forty years of age, used and abused his position as an adult and as a friend of some of the parents of the victims. He blatantly betrayed his position of trust that he held as the employer of these young girls. He illegally touched, grabbed, or fondled these young girls and, on one occasion, committed a repulsive act of rape on one of them.

The standard for reviewing the denial of a motion to reduce a sentence alleged to be so grossly disparate as "to be excessive although within the statutory limit" was set out by this court in *State v. Gordon,* 539 A.2d 528, 530 (R.I.1988). In *Gordon* we stated:

"The analysis begins with the proposition that the trial justice has the power to impose a more severe punishment than the prosecution recommends. * * * It is therefore within his discretion to increase the term to suit the circumstances of the particular crime involved. Although in arriving at his decision a trial justice may use benchmarks as a guide to the propor-

tionality of a term, he is bound only by the statutory limits. * * * Defense counsel's thorough examination of other * * * sentences may reveal a norm, but not a mandate. In formulating a fair sentence, the trial justice bears the affirmative duty to treat each defendant separately, focusing on the individual's unique background and character. *State v. Bertoldi*, 495 A.2d 247, 253 (R.I.1985)."

We are satisfied that the trial justice in this case gave solemn consideration to all the factors relevant to imposing an appropriate punishment. We are of the opinion that the trial justice remained soundly within the bounds of his discretion. The defendant's appeal on this ground is also without merit.

For all these reasons the defendant's appeal is denied and dismissed, the judgment of the conviction is affirmed, and the papers of the case are remanded to the Superior Court.