STATE

v.

Joseph GABRIAU.

No. 96–38–C.A.

Supreme Court of Rhode Island.

June 4, 1997.

Annie Goldberg, Aaron Weisman, Providence, for Plaintiff.

Paul J. DiMaio, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case came before us on appeal by the defendant, Joseph Gabriau (Gabriau), from a judgment of conviction entered in the Superior Court for the County of Providence upon a jury verdict finding him guilty of two counts of first-degree sexual assault in violation of G.L.1956 § 11–37–2 and one count of second-degree sexual assault in violation of § 11–37–4. After denying the defendant's motion for a new trial, the trial justice sentenced him to forty years, with twenty to serve, twenty suspended, and twenty years' probation, on each of the first-degree sexual-assault convictions and to twenty years, with twenty to serve, on the second-degree sexual-assault conviction. The sentences are to be served concurrently. In support of his appeal the defendant presents us with two claims of error. We deny his appeal in regard to both and affirm the convictions entered below. The facts of this case are as follows. Additional facts will be supplied insofar as they are pertinent to each issue raised on appeal.

On Saturday of Memorial Day Weekend 1991 Claudia Doe (Claudia), then seventeen years old, finished her classes at the Newport School of Hairdressing. She had planned for her friend Tracy Green (Tracy), then seventeen, to stop by after school. Tracy came by at about 3:45 p.m., accompanied by Jessica Brown (Jessica), whom Claudia estimated to be about sixteen, and Jessica's "Uncle Ed," whom Claudia estimated to be between thirty-five and forty years of age.[1]

The four of them proceeded to Jessica's father's residence on Coit Avenue in West Warwick. Entering through the kitchen, they found Uncle Ed's father, also named Ed, and Jessica's father, defendant Joseph Gabriau. The men were drinking beer, and after the girls sat down at the table, Gabriau asked someone to make a drink for Claudia. Jessica complied. Claudia testified that she proceeded to consume at least two drinks, which other witnesses testified were made of vodka and Kool–Aid. The defendant then suggested they drive to a liquor store to buy more alcohol. On the way back Claudia had to ask defendant to stop so she could vomit. Back at defendant's home, Tracy and Jessica told Claudia that Claudia's boyfriend had kissed Jessica. This revelation evidently prompted Claudia to place a telephone call to the boyfriend in order to "find out what really happened." After this call, she said, she passed out at the kitchen table. She testified that defendant and Jessica then helped her lie down on a fold-out chair that had been placed on the living-room floor. Claudia testified that she then "either passed out or fell asleep."

She awoke to find her pants and underwear off and her shirt and bra pushed up. The defendant was on top of her, holding her down. She testified that she screamed and tried to push him off, which efforts were unavailing. The defendant forced her to have vaginal, anal, and then once again vaginal intercourse with him. She said the assaults ended when someone entered the adjoining kitchen, and defendant got up and left the room. Claudia said that she pulled her underwear and shorts back on and ran through the kitchen and out of the home. At trial she claimed to have heard people laughing as she ran out but not to have seen anyone. Claudia ran to a neighboring house and called 911.

Officers from the West Warwick police department responded and found Claudia beside the road, crying hysterically. Her shorts were unzipped, her bra was pulled up over her breasts, and she had no shoes on

1. The last names of Tracy and Jessica are pseudonyms.

her feet. Claudia told the officers that she had just been raped by defendant. She was taken by a rescue vehicle to Kent County Hospital where a rape examination was conducted. Abrasions were noted on her knees, forearms, neck, and the left side of her head. As part of the rape examination evidence swabs were taken from the victim. These were sent to the Forensic Serology Laboratory at the Department of Health, which tested the samples and detected sperm on the vaginal and rectal swabs. These swabs, along with samples of the victim's and defendant's blood (taken pursuant to a warrant), were then sent to the Federal Bureau of Investigation Laboratory (FBI lab) for DNA analysis.

The trial justice conducted a preliminary hearing on the admissibility of the results

from the DNA analysis [2] and determined that the results would be admissible at trial.

On the following Monday officers went to defendant's home to execute a search-and-arrest warrant. A sweater and a single shoe, both identified at trial as belonging to Claudia, and the fold-out chair upon which the alleged assault had been committed were seized. Gabriau was found hiding in a cellar beneath the building and was arrested.

At trial FBI Special Agent Linda Harrison (Agent Harrison) was qualified as an expert [3] and testified that the sperm on the evidence swabs taken from the victim contained DNA matching that taken from the sample of defendant's blood at two genetic loci.[4] She testified that at two other loci the tests had proved inconclusive.[5] Agent Harrison's cal-

---

2. The trial took place prior to this court's decision in *State v. Morel*, 676 A.2d 1347 (R.I.1996).

3. In this case, the admissibility of DNA evidence was unchallenged. The sole question raised was the membership of the defendant in the sub-sets of Caucasian, Hispanic, and African–American populations, and the consequent relevance to defendant of statistical probabilities under the product rule and the ceiling principle methods of analysis.

Agent Harrison, assigned to the FBI DNA Analysis Unit when the samples in this case were analyzed, testified regarding the scientific protocol by which the FBI removes and compares samples of DNA from the suspect and crime scene (in the instant case, the victim) on the basis of the size of the genetic fragments they contain. The results are displayed on a piece of x-ray film (an autorad) as radioactive bands at the locations corresponding to specific fragments, which are sometimes referred to as "alleles." *See generally Morel*, 676 A.2d at 1350–52. If the bands for suspect and crime scene DNA samples appear to be aligned on an autorad, their placement is then checked by computer. *See id.* at 1352. If the two bands are located within a specified length, they are deemed a "match," which means that "the band patterns are consistent with the conclusion that the two DNA samples had the same source." *Id.*

Next, the statistical probability that a match between band patterns for suspect and crime scene DNA might occur at random is calculated. *Id.* In the instant case, two methods were used to make this calculation: the product rule (by which the probabilities that individual fragments will each occur at random in a given population are multiplied together) and the ceiling principle (by which existing population data is used to estimate the probability of a coincidental match). *See id.* at 1352–53.

Agent Harrison testified that statistical probability calculations using the product rule were done in this case using ethnic databases maintained by the FBI for African–Americans, Caucasians, and Hispanics. Agent Harrison also testified that the ceiling principle method had been used to make probability calculations in Gabriau's case. She said that this method was "ultra-conservative" and thereby benefited a defendant and that the FBI did not consider it necessary.

David Rand, Ph.D. (Dr. Rand), a population geneticist from Brown University, testified as an expert witness. He said that the FBI laboratory protocol for DNA analysis was generally accepted in the scientific community and that statistical analysis to find a random-match probability by use of the product rule was also scientifically accepted. He indicated that the FBI estimates of the random-match probability using the product rule were more scientifically reliable than those using the ceiling principle. He felt that the ceiling principle was too conservative. This presented no legal problem, however, as any error would be in defendant's favor. He finally testified that the FBI's analysis in Gabriau's case had been conservative. According to Dr. Rand, the laboratory technician had not considered two loci as matches where he himself would have.

4. Matches were shown at genetic loci D2S44 and D17S79.

5. These were genetic loci D1S7 and D4S139. In one case the bands shown on the autorad were too closely spaced to draw any conclusions. On the other autorad only one band of the victim's DNA was clearly visible. Agent Harrison made it clear that neither of these autorads was exculpatory, they were just not a clear enough match for her to have considered them inculpatory.

culation using the product rule [6] of the probability that a random, unrelated person might have a DNA profile matching that of Gabriau put the match in perspective by noting that

> "the probability that someone else would share his [genetic] profile in the [African–American] population was approximately [1] in [3300]. The probability [that] someone in the Caucasian population would share his particular profile was approximately [1] in [780]. And, the probability that * * * an unrelated person would share the same profile in the Hispanic community is approximately [1] in [520]. All of these probabilities would refer to unrelated individuals sharing that particular profile."

Agent Harrison finally testified that using the "more conservative" ceiling principle "which encompasses all three populations * * * [generated] the probability that an unrelated individual would share a profile with Mr. Gabriau * * * [of] approximately [1] in [297]."

Following the admission of testimony on the DNA evidence linking him to the rape, Gabriau, who was forty-six at the time of the incident, took the stand and testified that the intercourse had been consensual. He denied having had anal intercourse with the victim. In closing arguments defense counsel insinuated that perhaps anger toward her boyfriend had caused Claudia to have had intercourse with defendant. The jury returned with its verdict finding defendant guilty on three counts and not guilty of one count of first-degree sexual assault (vaginal intercourse).

We address defendant's contentions in the order in which they were presented.

## I

### Admission of DNA Testimony

The defendant first contends that the testimony of Agent Harrison on the probability of a random match among various racial groups should not have been admitted. After Agent Harrison had testified at the preliminary hearing on the random-match probabilities based upon African–American–, Caucasian-, and Hispanic-population databases, defense counsel asked her if she had calculated probabilities using the product-rule method for a match in a Native American or an Asian database. She said she had not. She then indicated that her testimony on the probability of a random match using the ceiling principle was also calculated using Caucasian-, African–American–, and Hispanic-population databases and did not include Asians or Native Americans.

■ Relying in part upon this testimony, defense counsel objected that the DNA evidence was irrelevant as it might not include defendant's racial group. The trial justice noted in reply:

> "You suggest your client is from some ethnic background that is not representative in those samples; that he's Asian? I look at him. He doesn't appear Asian. Doesn't appear to be [African–American]. Certainly doesn't appear to be anything other than Caucasian."

Rather than address the trial justice's observation, defense counsel argued that admitting testimony on the random-match probabilities without proof of his client's race would lead to speculation on the part of the jury.

At trial defense counsel continued his line of attack in the following exchange with Agent Harrison.

> "Q: * * * My question is that if Mr. Gabriau does not fit into Caucasian, [African–American], or Hispanic you have no testimony to give to this jury as to the probabilities of his DNA reports, do you, to the population?
>
> "A: No, I don't."

The defendant contends, on appeal, that given Agent Harrison's testimony, the admission of DNA evidence in this case was error. His contention really is that preliminary facts indicating the relevancy of the submission were not shown. *See* R.I. R. Evid. 104(b).

---

6. Agent Harrison's account of these calculations tracks the product rule method for *estimating the odds of a coincidental match* used by the FBI and described in *Morel*, 676 A.2d at 1352–55, although she referred to it as the "fixed bin method." "*Fixed bin method*" denotes the procedure used to obtain the data necessary for the calculations. *See id.* at 1354.

▮ We start our analysis by noting that decisions regarding the admission or exclusion of evidence on grounds of relevance are left within the sound discretion of the trial justice. *State v. Neri*, 593 A.2d 953, 956 (R.I.1991); *State v. Burke*, 427 A.2d 1302, 1304 (R.I.1981). We shall uphold the trial justice's ruling if any grounds supporting it appear in the record. *Corrado v. Providence Redevelopment Agency*, 117 R.I. 647, 655, 370 A.2d 226, 230 (1977); *Bruce v. State Department of Public Works*, 93 R.I. 466, 470, 176 A.2d 846, 848 (1962). Finally, on appeal we shall only disturb his or her decision when it constitutes an abuse of discretion, *Neri*, 593 A.2d at 956, and the admission of irrelevant evidence was prejudicial to the rights of the accused. *Burke*, 427 A.2d at 1304. Such prejudice exists "if we are unable to say whether the jury would have reached the same verdict if the evidence had not been improperly admitted." *Id.*

▮ In the courts of our state, decisions concerning the existence of preliminary facts are left for determination by the trial justice in evaluating the relevance of evidence. *See Romano v. Ann & Hope Factory Outlet, Inc.*, 417 A.2d 1375, 1378–79 (R.I.1980); R.I. R. Evid. 104(b). This process is necessarily a flexible one, and the trial justice is not bound by the normal rules of evidence, save those relating to privileges. R.I. R. Evid. 104(a). As Professor James Bradley Thayer noted many years ago, "In conducting a process of judicial reasoning, as of other reasoning, not a step can be taken without assuming something which has not been proved; and the capacity to do this, with competent judgment and efficiency, is imputed to judges * * * as part of their necessary mental outfit." Thayer, *A Preliminary Treatise on Evidence* 279–80 (1898). Therefore, as in the case at bar, " '[j]udicial notice is of particular importance in assisting the judge in formulating evidential hypotheses which will justify the admission of evidence * * *.' " 1 *Weinstein's Evidence*, ¶ 200[05] at 200–27 (1996).[7]

Here the trial justice noted that defendant appeared to be Caucasian in his response to defendant's relevancy argument. The trial justice's consideration of what he saw before him as part of his reasoning process was appropriate. As observed in a slightly different context, "In the vast majority of cases the race of [a defendant] will be known to any one who looks at him. * * * The triers of the facts will look upon the defendant sitting in the court room and will draw their own conclusions." *Morrison v. California*, 291 U.S. 82, 94, 54 S.Ct. 281, 286, 78 L.Ed. 664, 672 (1934)(Cardozo, J.).[8] When the trial justice notified defense counsel of his observation of defendant's apparent racial group, the burden of going forward shifted to defendant to show that a genuine issue of dispute in respect to defendant's race existed. Professor Charles Alan Wright has observed that the Advisory Committee's Note to Rule 104 indicates that the ambiguous term "preliminary questions" as used in the rule is intended to encompass issues of "preliminary facts" as well. These he defines as " 'fact[s] upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence.' " 21 Charles A. Wright & Kenneth W. Graham, *Federal Practice and Procedure*, § 5053 at 253–54 (1977) (quoting Cal. Evid.Code § 400). He notes that "[t]his awkward definition is used because it emphasizes the fact that it is not only the offeror who must prove preliminary facts.* * * In the argot of the trade, one may have to 'lay a foundation' for exclusion as well as admission." *Id.* at 254. As Justice Cardozo once noted, "[N]otice, even when taken, has no other effect than to relieve one of the parties

---

7. By "judicial notice" we refer not to the narrow concept embodied in Rule 201 of the Rhode Island Rules of Evidence and in the Federal Rules of Evidence, *see* Advisory Committee's Note to Federal Rule of Evidence 201, but to the broader concept, as aptly described by Judge Weinstein, "the judge's utilization of general knowledge and reasoning which are part of the educated layman's mental equipment." 1 *Weinstein's Evidence*, ¶ 200[01] at 200–4—200–5 (1996).

8. This sort of determination of someone's racial characteristics is frequently made in the context of challenges under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. *See, e.g., State v. Hunter*, 802 S.W.2d 201, 203 (Mo.Ct.App.1991); *Hill v. State*, 787 S.W.2d 74, 77 (Tex.App.1990).

to a controversy of the burden of resorting to the usual forms of evidence * * *. 'It does not mean that the opponent is prevented from disputing the matter by evidence if he believes it is disputable.' " *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio,* 301 U.S. 292, 301–02, 57 S.Ct. 724, 729, 81 L.Ed. 1093, 1100 (1937).

We finally note that here, where the ability to challenge the trial justice's observation was uniquely within defendant's knowledge and ability, it is especially appropriate to shift the burden of going forward to defendant to lay the foundation for exclusion. *See, e.g., Morrison,* 291 U.S. at 88–89, 54 S.Ct. at 284, 78 L.Ed. at 669, 9 Wigmore, *Evidence* § 2486 at 290 (Chadbourn rev.1981). Doing so presents no issue of the shifting from the state of the burden of proof on an issue going to an essential element of the case. *See In the Matter of Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *State v. Welch,* 117 R.I. 107, 109, 363 A.2d 1356, 1358 (1976); *State v. Main,* 94 R.I. 338, 346, 180 A.2d 814, 818–19 (1962). As we noted in *State v. Neary,* 122 R.I. 506, 511–12, 409 A.2d 551, 555 (1979), there is a

> "manifest distinction between the evidentiary concepts of the burden of production and the ultimate burden of proof. While the accused never bears the burden of satisfying the factfinder of his innocence or justification, and the prosecution always bears the burden of proving the guilt of an accused beyond a reasonable doubt in a criminal prosecution (*State v. Brown,* 97 R.I. 95, 196 A.2d 138 (1963); *State v. Stallman,* 78 R.I. 90, 79 A.2d 611 (1951)), the burden of going forward with the evidence may indeed shift from side to side, and this same burden may properly devolve upon a defendant once the state has developed a prima facie case and has adduced evidence sufficient to make it just that the defendant be required to challenge the proof with excuse or explanation. *See Patterson v. New York,* 432 U.S. 197, 203 n. 9, 97

S.Ct. 2319, 2323 n. 9, 53 L.Ed.2d 281, 287 n. 9 (1977), citing *Morrison v. California,* 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934)."

*See also Dowling v. United States,* 493 U.S. 342, 351 n. 3, 110 S.Ct. 668, 673 n. 3, 107 L.Ed.2d 708, 719 n. 3 (1990). In the case at bar defendant failed to make any effort to show that the issue of his own race was disputable. Rather than speculate concerning the reasons why he did not, we merely note that counsel, should he have wished to, could have easily brought defendant forward to offer evidence concerning his racial origin.[9] His failure to do so relieved the trial justice from any need to consider further counsel's unsupported suggestion that the evidence was irrelevant.[10] For us to rule otherwise would be to elevate every naked assertion by counsel into an issue requiring proof by the state. This we decline to do.

## II

### Refusal by the Trial Justice to Allow Defendant to Read Sections of the Victim's Prior Statements into the Record

Claudia testified at trial that after the rape she ran through the kitchen and out of the house. She testified she did not see anyone as she left but that she did hear laughter. After laying a foundation that the victim had testified before both the Grand Jury and defendant's probation-violation hearing, defense counsel questioned Claudia about her testimony that she had not seen anyone in the kitchen in order to impeach her claim. Cross-examination on this issue covered ten pages of the trial transcript. Some relevant excerpts are as follows:

> "Q: Do you recall at a hearing being asked this question * * * page 28, Your Honor please.

> "THE COURT: For the record, this hearing occurred June of 1991.

> " * * *

---

9. We note that any testimony by defendant at the preliminary hearing would not have been admissible against him at trial. *See Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259 (1968).

10. We need not comment on the merits of defendant's contentions since he failed to support them adequately before the trial justice. *But see People v. Pizarro,* 10 Cal.App.4th 57, 12 Cal. Rptr.2d 436 (1992).

"Q: Question: 'And when you ran through the kitchen did you observe anyone to be there? Answer: Yes, two men that were there earlier were sitting there, and Jessica was there.' Do you remember saying [then] that when you ran in the kitchen those people were there?

"A: I could have said that, I don't remember.

"* * *

"Q: What don't you remember, this question and answer, or what happened that day?

"A: I don't remember saying anything like that.

"Q: You don't. Do you deny saying it?

"A: I don't deny saying it. I just don't remember.

"* * *

"Q: Do you recall this question, 'You believed Jessica was in the kitchen while you were being raped, getting raped?' Your answer, 'I believe all of them was in the kitchen.' Do you remember that question and answer?

"A: I don't remember the question.

"Q: You don't remember the answer, either?

"A: No.

"Q: Question, 'While you were screaming and all of that?' Answer: 'Yes.' So, you don't remember saying at a prior hearing under oath that you believed everybody was in the kitchen while you were being raped? Don't remember saying that?

"A: I don't. I really don't.

"Q: And, you don't remember saying that you saw all these people in the kitchen when you left that back room?

"A: I could have said it. I just don't remember. I remember people were laughing, so people had to have been there. I just don't remember if I saw them or not.

"Q: When you say you could have said it, that you could have said it under oath you said that?

"A: If I said that at the time then it had to have been true. I was under oath."

Later defense counsel returned to this subject with the following exchange taking place:

"Q: Now, we discussed yesterday that you know that you have testified several times before, both at grand jury and at a hearing, that when you went out in the kitchen there were people there. You know you have testified to that before, is that correct?

"A: Yes, sir.

"Q: And, you know that you named who they were, is that correct?

"A: Yes.

"Q: And now yesterday you indicated to us that you don't remember who is there?

"A: I don't remember. I don't remember seeing the people, like, looking physically at them. I just remember hearing them laugh.

"* * *

"Q: * * * Is it that today you don't remember whether or not you could identify people in the kitchen the time you ran out?

"A: No. At that time when I testified that I saw the people it was in my memory. I saw them back then. Now, I—just so long I don't remember physically seeing them. I just remember them laughing."

Later defendant sought to have put in evidence, as past recollection recorded, "different sections" from the transcripts of the victim's prior testimony under Rule 803(5) of the Rhode Island Rules of Evidence. The trial justice noted in reply: "There are certain requirements, foundationally, to admit such written documents. And, ordinarily, my recollection is they are the writings of the person, not the testimony orally given," adding "[t]ake another look at it. We don't have to do it now." The trial justice also advised counsel, "[N]ot only should you look at Rule 803(5) you should look at 801." He even helpfully added, "You should look at the case of *State v. Maniatis* decided by the Supreme Court about two hours ago." After hearing arguments on defendant's request, the trial justice said he felt the material was Rule 801(d)(1)(A) material rather than Rule 803(5) material. Since defendant had been able to confront the witness and the jury had heard the prior inconsistent statements, he denied the motion. The defendant contends that this denial was in error and that it denied

him the ability to show that the victim's story was implausible.

■ Our review begins, as the trial justice foretold, with Rule 801(d)(1)(A). This rule defines all prior inconsistent statements as not hearsay and allows their admission as substantive evidence so long as the declarant testifies at trial and is available for cross-examination. In doing so, the rule modifies prior Rhode Island practice that had admitted such statements only for impeachment purposes. *State v. Pusyka*, 592 A.2d 850, 853 (R.I.1991). As the trial justice noted, however, *State v. Maniatis*, 657 A.2d 149 (R.I. 1995), undercuts defendant's contention. In that case we held that "[i]ntroduction of a statement as substantive evidence does not mean admission of the physical paper itself. A statement is admitted substantively when a witness testifies to it without an instruction limiting the purpose for which the jury can consider it." *Id.* at 157.

In the case at bar the judge found that the jury members had heard the prior inconsistent statements and were well aware they had been made by the victim. Reviewing this determination for an abuse of discretion, *Pusyka*, 592 A.2d at 853, we find that there was no error in the trial justice's ruling. *Cf.* *State v. Tempest*, 651 A.2d 1198, 1209 (R.I. 1995) (jurors may infer statements read from paper are those of witness). Since the jury understood the nature of the oral testimony and no limiting instructions were given, the statements were admitted within the contemplation of Rule 801.

■ The defendant contends in addition that Rule 803(5) also allows the victim's prior statements to be received as an exhibit and read into the record.[11] We are in complete agreement with the trial justice, however, that the foundation requirements were not met in this case. The requirements for admitting memoranda of past recollection re-corded are well recognized. They require (1) that the witness whose prior statement is sought to be introduced "have [had] firsthand knowledge of the event in question," (2) that the recording whose admission is sought was made "at or near the time of the event while the witness had a clear memory," (3) that the witness is now "unable to recall the incident independently," and (4) that the witness can attest that the recorded recollection was accurate when made. *State v. Ricci*, 639 A.2d 64, 67 (R.I.1994); *State v. Vento*, 533 A.2d 1161, 1165 (R.I.1987).

In *Vento* we rejected an identical challenge to that presented by the defendant, noting that "the victim cannot vouch for the accuracy of the hearing transcript; thus, the defense cannot comply with an essential element of past recollection recorded." 533 A.2d at 1165. Although this may seem a technical requirement, it is not.

Past recollection recorded has historically been a vehicle for the admission of prior statements when live testimony is not available because of a lack of memory. The prior-recorded statement acts as a substitute for testimony the witness is currently unable to give. *See* 4 *Weinstein's Evidence*, ¶ 803(5)[01] at 803–172 (1996); 3 Wigmore, *Evidence* § 735 at 78–83 (Chadbourn rev. 1970). As *State v. Contreras*, 105 R.I. 523, 253 A.2d 612 (1969), described the process, "a recollection which, although it once existed, has vanished completely and has been replaced by a written record of that past recollection which the witness is willing to adopt as his present testimony." *Id.* at 539, 253 A.2d at 621. The admission of the document itself is based upon the notion that the prior statement substitutes for the current lack of adequate memory of the events. As *Contreras* noted, "In the case of 'past recollection recorded' the witness definitionally will have no independent recollection of what he wrote and, since the writing will in essence be an

---

11. Rule 803 of the Rhode Island Rules of Evidence provides in pertinent part:

" The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(5) *Recorded Recollection*. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit."

embodiment of his testimony, he will have used it in testifying as a substitute for any present recollection. When that is the case, the courts will usually permit the document to be read and even to be shown to the jury." *Id.* at 540, 253 A.2d at 621.

In the case at bar the victim testified that she remembered the incident but did not remember seeing faces. Her prior statements can be used, as they were in this case, to impeach this testimony. As substantive evidence the jury can, of course, believe the prior statements over those given in court. However, these prior statements cannot be made to constitute past recollection recorded when she has provided substantive testimony on this issue from independent memory. It is the agreement by the witness that a prior recorded recollection adequately substitutes for testimony that, but for a lack of current memory, would have been presented in court, which makes the reading of the prior recollection recorded into the record possible. Nothing in Rule 803(5) allows a defendant to transform a prior inconsistent statement into a memorandum of past recollection recorded. We would be ignoring the logical and historical roots of this exception to the hearsay rule to hold otherwise. No error occurred in the denial of the defendant's offer.

### Conclusion

For the foregoing reasons the defendant's appeal is hereby denied and dismissed. We affirm the judgment of conviction entered in the Superior Court. The papers in the case may be remanded to the Superior Court.

GOLDBERG, J., did not participate.